TRI-TERMINAL CORPORATION, PETITIONER-APPELLANT,
    v. BOROUGH OF EDGEWATER, RESPONDENT-RESPON-
    DENT.

Argued September 23, 1975—Decided October 20, 1975.

*Mr. Kenneth D. McPherson* argued the cause for petitioner-appellant (*Messrs. Waters, McPherson and Hudzin,* attorneys).

*Mr. William C. Meehan* argued the cause for respondent-respondent (*Messrs. Contant, Contant & Meehan,* attorneys).

The opinion of the Court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. These are tax cases involving real property of an industrial nature and concern assessments for the tax years 1971 and 1972. As narrowed on the presentation to this Court, the issue of excessiveness of the assessments above true value is not raised, but only alleged discrimination by the asssesor in valuing these parcels for assessment purposes. The prime question before us is whether the discrimination remedy sanctioned by this Court in *In re Appeal of Kents 2124*

*Atlantic Ave., Inc.,* 34 *N. J.* 21 (1961), is appropriate where a municipality has adopted a practice of regular periodic revaluations for assessments.

Two improved parcels of property are involved. They may be referred to as the Alcoa tract and the Ford tract. The details of the physical status of the properties are not material to the single issue presented. The Alcoa tract assessments for both years (assessing dates being, respectively, October 1, 1970 and October 1, 1971) were:

| | | |
|---|---|---|
| Land | | $ 213,900 |
| Improvements | | 2,613,600 |
| | Total | $ 2,927,500 |

The Ford tract assessments for those years were:

| | | |
|---|---|---|
| Land | | $ 1,249,000 |
| Improvements | | 3,669,400 |
| | Total | $ 4,918,400 |

The testimony in the case establishes that these assessments represent substantially the result of a revaluation of all assessed properties in the municipality by an independent appraisal firm, with the concurrence of the assessor, put into effect for the tax year 1969 as of October 1, 1968. The revaluation had been ordered by the Bergen County Board of Taxation. See *Bergen Cty. Bd. of Tax. v. Bor. of Bogota,* 114 *N. J. Super.* 140, 144–145 (App. Div. 1971). Except for new construction, all assessments, including those here involved, have been carried forward intact from the 1969 revaluation year through the tax years 1971 and 1972.[1] New construction was assessed at 1969 values.

The taxpayer filed appeals from the assessments for both tax years 1971 and 1972 with the Bergen County Board of Taxation which affirmed the assessments. Appeals from those judgments were taken to the Division of Tax Appeals on

---

[1] There has been a new independent revaluation as of October 1, 1973 for the tax year 1974. The 1974 assessments based thereon are $5,927,600 for the Alcoa tract and $10,895,100 for the Ford tract.

both true value and discrimination grounds. The cases were tried together before the Division.

On the Alcoa tract, the Division found that the true value claim had not been substantiated by the taxpayer and dismissed it. On the discrimination phase of the case the Division reasoned that it was incumbent on the municipality to establish "some common level" in the municipal assessments generally and that it had not done so. It was consequently held, apparently pursuant to the rule of the *Kents* case, *supra,* that the arithmetic average of the two average ratios reflected for the years 1971 and 1972 by the sales studies of the Director of the Division of Taxation — being 67.55 — should be applied as a percentage to the "determination of true value," *i. e.,* the assessed valuations. This resulted in judgments reducing the assessment of the property to

| | |
|---|---|
| Land | $  313,900.00 |
| Improvements | 1,220,092.29 |
| Total[2] | $1,533,992.29 |

On the Ford tract, the Division rejected the conclusions as to true value offered by the expert witnesses on both sides and made its own determination of the true value of the improvements, fixing the amount thereof at $3,315,832. Adding that sum to the unchanged land assessment produced a Division true value total of $4,564,832. On the same rationale as used by it in the discrimination phase of the Alcoa tract appeal, the Division applied the average of the Director's ratios aforementioned (67.55) to the determined true value and fixed the assessment of the Ford tract for the years in question at (in rounded figures) :

| | | |
|---|---|---|
| Land | | $1,249,000 |
| Improvements | | 1,851,000 |
| | Total | $3,100,000. |

---

[2]The Division's calculation is incorrect. Application of the stated percentage should have resulted in a total assessment of **$1,977,526.** In the light of our determination of the appeal, the error is not material.

The municipality appealed the judgments of the Division to the Appellate Division. There was no cross-appeal by the taxpayer. The Appellate Division held that the Division of Tax Appeals erred in finding that there was no common level of assessment in Edgewater for the years in question and in applying the Director's ratios to give discrimination relief. The court ruled that the uniform assessment of all properties at 100% of their true value as determined by the October 1, 1968 revaluation constituted a common level for purposes of meeting a discrimination appeal. We are in essential accord with that holding, for reasons to be further explicated hereinafter.

On the true value phase of the case the court analyzed the proofs and concluded that the Division's determination of true value of the improvements on the Ford tract was not supported by sufficient evidence. The court exercised its own fact-finding jurisdiction, determined that the true value of the Ford tract was, for both tax years, the same as the assessments, and restored the original assessments on both tracts for the tax years involved. We granted certification. 68 *N. J.* 155 (1975). No issue is raised before us by the taxpayer as to the true value aspect of the decision of the Appellate Division, and we shall consequently not discuss it save as it may be incidentally relevant to the discrimination issue.

It is fundamental that a taxpayer is entitled to "treatment commensurate with that given his fellow taxpayers within the municipality" and that if it is not accorded, he is entitled to a judicial or quasi-judicial remedy. *In re Appeals of Kents 2124 Atlantic Ave., Inc., supra,* 34 *N. J.* at 25; *Feder v. City of Passaic,* 105 *N. J. Super.* 157, 160–161 (App. Div. 1969). By definition, a taxpayer has no discrimination grievance if the standard of valuation generally applied in the taxing district, if one is discernible, is not more favorable than that which has been applied in the assessment of his property. The short-hand term gen-

erally employed since *Kents* for the just stated standard of valuation is a "common level". A common level for this purpose may be one which the assessor "consciously seeks to employ" throughout the taxing district (see *Kents, supra,* 34 *N. J.* at 30), provided the evidence reveals reasonably consistent adherence thereto. The central holding in *Kents* was that where there is no showing by the taxing district of a common level of assessment, the average ratio of the Director's sales ratio studies for the year in question for the particular municipality may be used as *prima facie* evidence of the level to which the true value of the property may be reduced if substantially greater than such ratio.[3] See 34 *N. J.* at 31.

The evolution of the discrimination remedy declared in *Kents* was against the background of the then common pattern of planlessness and chaos in local assessing practices. These conditions rendered a taxpayer who felt that he was discriminated against unable to prove his case and therefore remediless. See 34 *N. J.* at 29–30; *Tp. of Willingboro v. Burlington Cty. Bd. Tax., supra,* 62 *N. J.* at 208–209; *Switz v. Middletown Twp.,* 23 *N. J.* 580 (1957). In *Kents* Chief Justice Weintraub expressly recognized that the taxpayer's exigency there presented could have been avoided if the taxing district had conducted periodic general revaluations of all ratables throughout the district. 34 *N. J.* at 29, 32. He stated that if the remedy there granted provoked, as feared, "a flood of appeals," this might "well quicken the official conscience and induce the district to revalue and to keep the rolls current". 34 *N. J.* at 32.

---

[3]The purposes and functions of the Director's sales ratio studies are explained at length in *Tp. of Willingboro v. Burlington Cty. Bd. Tax.,* 62 *N. J.* 203, 209–213 (1973). Their prime value lies in estimating *aggregate* true values of ratables in a municipality and average ratios of *aggregated* assessed valuations to true values, not in determining the true value of particular properties or the ratio of assessment to true value of a particular property.

In any event, beginning shortly before the decision in *Kents,* and spurred by such decisions mandating assessment at true value as *Switz v. Middletown Twp., supra,* and *Ridgefield Park v. Bergen Co. Bd. of Taxation,* 31 *N. J.* 420 (1960), the local property tax bureau of the State Division of Taxation and the county boards of taxation influenced taxing districts throughout the state to improve their assessing practices and particularly to conduct general revaluations at frequent intervals. See *Tp. of Willingboro v. Burlington Cty. Bd. Tax., supra,* 62 *N. J.* at 209. Undoubtedly as a result thereof, Edgewater conducted such revaluations in 1960, 1968 (that here involved) and in 1973, each applicable to the next tax year. See *Bergen Cty. Bd. of Tax. v. Bor. of Bogota, supra.*

It is thus apparent that the tax years here in question, 1971 and 1972, are about half way between general revaluations in the taxing district. The present taxpayer has not challenged the relative fairness of the 1969 tax-year reassessment of its properties *vis a vis* those of other taxpayers generally in the taxing district. It is manifestly evident in the record that real property generally in the municipality, as indeed almost universally, was in a rising trend of value as of October 1, 1968 and has been continuously since. The taxpayer did not challenge the testimony of the borough's expert that property in Edgewater, including its own, was rising in value from 8% to 12% annually from 1968 to 1972 and beyond. The Director's ratios, relied upon by the taxpayer for other purposes, are indicative of the same general trend, and of the fact that as a result of constancy in the assessments since 1969, ratables were being assessed on the average at substantially below their current market values by 1971 and 1972.

In this posture of the case, the most determinative factor is that the taxpayer has made no effort to show that, relative to the generality of other assessed real property in the municipality, its property is being assessed on a less

favorable basis. It has not shown, and does not claim, that the value of its property has not sustained the same enhancement in true value between 1969 and the instant tax years that has undoubtedly attended the generality of other properties and which, at least *prima facie,* would seem to leave in a position of relative uniformity of tax treatment all property owners whose 1971 and 1972 assessments are at the same level as was fixed by a concededly fair and accurate general revaluation in 1968-1969. *Cf. Continental Paper Co. v. Vil. Ridgefield Pk.,* 122 *N. J. Super.* 446, 455 (App. Div. 1973), certif. den. 63 *N. J.* 328 (1973). We cannot sum up the deficiency in taxpayer's case better than to say it has not met the *Kents'* criterion (34 *N. J.* at 33) : "A taxpayer who seeks a reduction of an assessment below true value must prove that his share of the total tax burden substantially exceeds the share allocated to others generally." In short, Edgewater assessed at a common level in 1971-1972, and this taxpayer was assessed at that level.

Taxpayer argues that it demonstrated the absence of a common level here for 1971 and 1972 in that the assessor testified, contradictorily, that his assessments for those years were at full current true value while admitting that the assessments generally were carried forward from year to year from those established at 1969 true value appraisals — concededly a lower level. The assessor's inconsistency is inescapable but so is the fact of the matter. The assessments were constant from 1969 through 1972. But we see no reason why a 1969 true value standard uniformly applied is not an acceptable common level in 1971 and 1972 for purposes of refuting a discrimination claim. As noted above, all taxpayers were treated alike in a period of generally rising values. If the instant taxpayer could show imperviousness of its property to the rising trend such as to render its assessment ratio substantially higher than the generality of others, a colorable claim might be asserted. But that is not this case.

Taxpayer also argues that the wide range of ratios of assessments to sales prices reflected in individual sales of property in Edgewater shown in the Director's sales studies for 1971, varying from 23.55% to 108.70%, is demonstrative of the absence of uniformity in treatment of taxpayers or of a common level. The argument lacks merit. The 1971 sales in the Director's study numbered 34 of a total of some 1500 assessed parcels. Isolated sales may for any number of reasons produce unduly high or unduly low prices. As noted above, even so limited a sampling may nevertheless be useful in demonstrating an average ratio of aggregate assessments to aggregate market prices, but the outer ratio range of individual sales does not necessarily reflect the degree of departure from general uniformity of asssssments of properties *inter sese*. Indeed, a substantial degree of uniformity may here well be the proper conclusion.[4]

What we have said above concerning the assessor's practices in this matter, viewed from the standpoint of a discrimination attack, impels the admonition that those practices are not necessarily approved as sound in relation to the proper assessment of individual properties. The law calls for the separate assessment of each parcel annually at its true value on the assessing date. *In re Appeal of City of East Orange,* 103 *N. J. Super.* 109, 113 (App. Div. 1968).

---

[4]Our analysis of the 34 1971 sales referred to shows an average (unweighted) ratio of about 58% (for present purposes an unweighted ratio is preferable to the Director's weighted ratios; see Handbook for New Jersey Assessors (rev'd. 1965), p. 203 (by Bureau of Government Research, Rutgers, the State University)). The ratios of the 34 individual sales reflect a coefficient of deviation from the average of about 20%. The cited Handbook states (at p. 203) that "A coefficient of deviation of less than 20% is usually considered good," *i. e.*, not requiring a revaluation. If one eliminates the four sales of most extreme deviation the remaining 30 show a coefficient of deviation of 16%. The coefficient of deviation in the 17 sales in the 1972 study is about 16%. Thus the two-year sampling of sales apparently shows an average coefficient of deviation which is "good".

414

While practicalities obviously preclude most assessors reviewing every assessment line item every year, see *Bergen Cty. Bd. of Taxation v. Bor. of Bogota,* 104 *N. J. Super.* 499, 507 (Law Div. 1969), there should nevertheless be alertness to changed valuation factors peculiarly affecting individual properties in years between revaluations and requiring prompt revision of such assessments in fairness to the particular taxpayer or to the taxing district. *Cf. Tp. of Willingboro v. Burlington Cty. Bd. Tax., supra,* 62 *N. J.* at 213–214. It should be obvious that, absent such attention, the carrying over of assessments each year from one general revaluation to the next is not the proper discharge of the assessor's function.

For the reasons stated the judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For reversal*—None.