157 N.J. Super. 42 (1978)
384 A.2d 531
THE ANACONDA COMPANY (FORMERLY KNOWN AS INTERNATIONAL SMELTING & REFINING CO.), PETITIONER-APPELLANT AND CROSS-RESPONDENT,
v.
THE CITY OF PERTH AMBOY, IN THE COUNTY OF MIDDLESEX, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 25, 1977.
Decided February 27, 1978.
*43 Before Judges LORA, SEIDMAN and MILMED.
*44 Mr. Burtis W. Horner argued the cause for petitioner-appellant and cross-respondent (Messrs. Stryker, Tams & Dill, attorneys;[*]Mr. Horner, of counsel; Mr. Stephen D. Cuyler on the brief).
Mr. Leo Rosenblum argued the cause for respondent and cross-appellant (Messrs. Rosenblum & Rosenblum, attorneys).
The opinion of the court was delivered by MILMED, J.A.D.
These are appeals and cross-appeals from judgments of the Division of Tax Appeals (Division) concerning local property assessments for the years 1968 through 1974 on certain real property owned by The Anaconda Company (formerly International Smelting & Refining Co.).
The property, consisting of some 53 acres of land designated as Block 13, lot 1 and Block 14, lot 1, with improvements comprising petitioner's (Anaconda's) Perth Amboy plant, an electrolytic copper refinery, is bounded on the north by a railroad, on the south by the Raritan River, on the east by lands of another railroad, certain scrap dealers and other light industrial uses, and on the west by property of Chesebrough-Ponds and a company which manufactures asphalt coatings. The various improvements on the property were constructed over the period from 1898 to 1953, with most being erected around the turn of the century. At the Division hearing[1], the mechanical superintendent at the plant[2] described the process undertaken at the facility and the flow of material through the process. He testified:
Q Mr. Emley, would you kindly describe for us the process that takes place at the Anaconda facility in Perth Amboy?
*45 A We are an electrolytic refinery. We receive crude copper or copper scrap which is melted and cast into a shape which is transported to the tank house; at that point it is refined, and the result is another pure copper plate. The purity is approximately 99.99 percent pure copper. The residue consists of gold and silver, platinum and palladium, selenium and tellurium. These are refined in other parts of the plant.
The purified copper takes the form of a cathode. These cathodes are then carried by rail to either storage or one of the three casting buildings. In the casting buildings, they are melted down and cast into finished shapes such as wire bars, billets and cakes. All cast shapes are then carried by forklift or rail to a storage area and made up into shipping lots which are shipped by rail, truck and water.
Q Would you, using P-1, identify the flow of material through the process as you have just described it?
A If the material is received by water, it is unloaded at our docks, the dock area being described on the map with numerical numbers 202 and 204, and either placed in storage or directly on industrial cars. The material is taken either directly to the No. 1 Casting Building which is identified as Building 73 or stockpiled for later use. Material is also brought in by truck and unloaded in the area of the Brick Sheds, which are identified as Nos. 83 and 101; unloaded there and baled for future charging into the furnaces in Building 73.
Both rail and truck shipment deliveries are made to this same general location. Materials delivered in this manner are usually scrap copper which can be baled and later loaded into the furnaces in Building 73.
Petitioner's supply of raw material in the form of blister copper from Chile started to decrease in 1965. Its manager at the Perth Amboy plant testified at the Division hearing that
Copper was supplied in declining amounts to the Perth Amboy plant until 1971 when the regime of President Allende nationalized the mines, and at that time, that source of copper ceased to exist for the Perth Amboy plant. From that time we had to depend upon buying copper from wherever we could get it, whether it was from parts of the United States, Africa, Chile or Peru. In addition to that, we have been forced to depend heavily on purchases of No. 2 scrap copper. We have continued from 1971 to the present time under these conditions related to supply.
*46 In the past years, economic conditions have made it exceedingly difficult to get sufficient copper into the Perth Amboy plant to maintain operations. Handling of No. 2 scrap copper, for example, causes difficult problems in material handling which adds to the cost of the finished product; in addition, No. 2 scrap has created serious problems of air pollution, and to meet the state codes for compliance, additional financial costs have been added which forced us to shut down many of our operations.
Petitioner's costs of maintenance and repairs have been substantial. Thus, the 1972 costs for maintenance amounted to $3,400,000, and for repairs $700,000. The corresponding totals for 1974 were: $4,400,000 for maintenance and $950,000 for repairs. While age is obviously one factor which accounts for the condition of the improvements, Anaconda points to other factors which it argues combined to force a suspension of operations in June 1975 and a sale of the plant in May 1976, viz., the termination of its supply of Chilean copper and its inability to cope with air and water pollution problems.
We are entirely satisfied from the record before us that the industrial complex at the site, used as a copper refinery, was special purpose in nature, and that the only proper appraisal approach for evaluating it was the cost approach. This involved consideration of the replacement cost of the improvements with allowance for physical depreciation and all forms of obsolescence.
Using this appraisal approach, Perth Amboy's experts valued the improvements as follows:

 Reproduction Cost Depreciated
 New[3]Values[4] *47 1968 $38,011,000 $14,392,000
1969 38,751,000 14,719,000
1970 40,442,000 15,378,000
1971 43,295,000 16,580,000
1972 46,211,000 17,857,000

Using the same appraisal approach, Anaconda's expert valued the improvements for each of these five years at: reproduction cost new of $13,901,665, reduced to $3,959,704 after physical depreciation, and further reduced to $1,306,702 after making allowances for functional and economic obsolescence.
The Division judge properly discarded petitioner's projections of value based on the market data (comparable sales) and economic (income capitalization) approaches, and correctly determined that the best appraisal procedure for valuing this special purpose industrial complex was the cost approach, i.e., reproduction cost less depreciation. For the years 1968, 1969 and 1970, he accepted petitioner's (reproduction cost less physical depreciation) aggregate valuation for improvements of $4,000,000[5], adding petitioner's valuations for certain machinery and equipment which he (the Division judge) deemed taxable as real property. Adding the stipulated land value of $578,940 for each of these three years, he arrived at the following total valuations: $4,769,640 for 1968; $4,736,840 for 1969 and $4,712,440 for 1970. Finding these values to be "greater than the assessments for those years,"[6] he dismissed petitioner's appeals for 1968, 1969 and 1970.
*48 Petitioner omitted to file any appeal to the Division for 1972. Perth Amboy filed its own appeal for that year and also for 1971. Both appeals were dismissed. The Division did not enter any judgment fixing assessments for 1972.
In his original written opinion in the matter, the Division judge commented that
For the year 1971 and succeeding years, consideration must be made for the factors that have drastically effected [sic] this property in relation to value. Based on the courts [sic] own experience and expertize [sic], a deduction of 12 1/2% will be made on the real property assessments for 1971 and the years following.
In his revised opinion he stated that
In the final evaluation of the subject property the court accepted the estimate made by the taxpayer's expert witnesses. In addition to their estimate the court granted a further decrease of 12 1/2% on its own estimate. The resulting final evaluation was made after considering all of the factors and issues involved here including functional obsolescence.
For the years 1971 and 1972 Perth Amboy continued to assess at the county ratio of 50% of true value. At that level the aggregate assessments for each of these years were $799,050 for land and $2,131,700 for improvements, for a total of $2,930,750. The Division's valuations for the tax year 1971 at the same 50% level were: $799,050 for land and $1,808,650 for improvements, for a total of $2,607,700.
During 1973 and 1974 Perth Amboy assessed at 100% of true value, its aggregate assessments on the subject property for each of these years being:

 Land $1,758,000
 Improvements $4,263,400
 __________
 Total $6,021,400

The Division's aggregate valuations at the 100% level for the two years were:

*49
 1973 1974
 Land $1,598,100 $1,598,100
 Improvements $3,771,100 $3,759,600
 __________ __________
 Total $5,369,200 $5,357,700

Four principal issues are raised on these appeals and cross-appeals: (1) whether the Division made adequate allowance for all forms of obsolescence; (2) whether the Freeze Act, N.J.S.A. 54:2-43, should be applied for the year 1972 despite the taxpayer's failure to file a tax appeal to the Division for that year; (3) whether the taxpayer is entitled to discrimination relief; and (4) whether the Division erred in ruling that much of the process equipment should not be assessed as real property under the criteria set forth in National Lead Co. v. Sayreville, 132 N.J. Super. 30 (App. Div. 1975).

I
We find no merit in petitioner's claim that the Division erred in failing to make "an allowance for functional obsolescence for any year and in only making an allowance for economic obsolescence for 1971, 1973 and 1974." As previously noted, the Division judge specifically pointed out in his "revised" or supplementary opinion that in reaching his valuation for the property he "accepted the estimate made by the taxpayer's expert witnesses," and
In addition to their estimate the court granted a further decrease of 12 1/2% on its own estimate.
He concluded his revised opinion with the statement that
The resulting final evaluation was made after considering all of the factors and issues involved here including functional obsolescence.
The Division's valuations for improvements for the tax years 1971, 1973 and 1974 were undoubtedly arrived at by *50 that announced procedure. Thus, it is clear that for each of the tax years the Division judge started with the rounded taxpayer's estimate of $4,000,000, reduced that by 12 1/2% to $3,500,000, and added to that the taxpayer's estimate of the value of certain items of machinery and equipment deemed real property, to arrive at the Division's final valuations. It is equally clear that the 12 1/2% decrease was not only for the expressed "functional obsolescence," but was to cover economic obsolescence as well. See, for example, the comment from the Division judge's original written opinion in the matter, which we quoted earlier in this opinion. In it, the Division judge, in deciding upon "a deduction of 12 1/2%," refers to "the factors" which have drastically affected the subject property "in relation to value." It is obvious from a reading of both the original and the "revised" Division opinions that two of those "factors" were, as the Division judge mentioned, termination in 1971 of "the source of raw material from Chile" and "the stringent ecology programs" which "began to seriously effect [sic] the economy of this aging industrial complex."
As previously noted, for each of the tax years 1968, 1969 and 1970 Perth Amboy assessed the land and improvements at 50% of true value, the county ratio at the time. The full valuation for improvements to which the taxing district applied the 50% ratio was $2,758,780 as compared with an improvement valuation of $4,000,000 which was accepted by the Division. Thus, as counsel for Perth Amboy correctly reasons:
Manifestly, even if the 12 1/2% allowance for all forms of obsolescence had been affirmatively set forth by the Division in its opinion for those earlier years the net result of the valuation of the improvements still would be $3,500,000 or approximately $750,000 in excess of the improvement assessments in those years. Under the circumstances, the Division had no choice but to dismiss the appeals for such years.
We further note that in his testimony at the Division hearing the mechanical superintendent at the refinery agreed *51 that the entire plant was at the time "essentially serving the purpose for which it was normally built."
While we recognize that "the problem of estimating [the] discount [for obsolescence] in quantitative terms is * * * difficult," 2 Orgel, Valuation Under The Law of Eminent Domain (2 ed. 1953), § 199 at 57, we are, nonetheless, from our review of the record, satisfied that the Division's determination to allow the 12 1/2% decrease for obsolescence is "supported by substantial credible evidence on the whole record, allowing for agency expertise and evaluation of the credibility of witnesses." Parkview Village Asso. v. Collingswood, 62 N.J. 21, 34 (1972). We are further satisfied that such allowance was intended and adequate to compensate for both loss in value resulting from conditions inherent within the property itself (functional obsolescence) and loss in value resulting from conditions outside the property (economic obsolescence). We find no justification for disturbing it. Passaic v. Gera Mills, 55 N.J. Super. 73, 91-92 (App. Div.), certif. den. 30 N.J. 153 (1959).

II
The Division erred in not applying the Freeze Act (N.J.S.A. 54:2-43) to the tax year 1972. As we indicated earlier, the petitioner did not file any appeal with the Division for 1972. Perth Amboy filed its own appeal for that year and also for 1971. N.J.S.A. 54:2-43 provides in pertinent part that
Where a judgment final has been rendered by the Division of Tax Appeals in the State Department of Taxation and Finance [Department of the Treasury] involving real property such judgment shall be conclusive and binding upon the municipal assessor and the taxing district, parties to such appeal, for the assessment year and for the 2 assessment years succeeding the assessment year covered by the final judgment, except as to changes in the value of the property occurring after the assessment date.
*52 In his revised opinion of July 8, 1976 the Division judge, relying on the opinion of this court in Passaic v. Gera Mills, supra, decided that "[a] judgment for 1972 cannot be given by this court [Division] because petitioner failed to file appeals for that year." In so holding he obviously failed to distinguish the factual situation in this case from that involved in Passaic v. Gera Mills, which concerned City of Passaic appeals from Division judgments for the years 1954, 1956 and 1957. On the issue of "[w]hether the Freeze Act might apply to the tax year 1955 on the basis of a 1954 judgment favorable to the municipality," we held that that "was a legal question not to be determined in hearings before the Division of appeals specifically limited to the tax years 1954, 1956 and 1957." We concluded that
The Division would have no power to render such a judgment; there was nothing pertaining to the year 1955 legally before it. [55 N.J. Super. at 94; emphasis supplied]
Here, however, the Division did have before it Perth Amboy's appeal for the tax year 1972. No taxpayer appeal for that year was necessary. See Boys' Club of Clifton, Inc. v. Jefferson Tp., 72 N.J. 389, 405 (1977); Union Terminal Cold Storage Co. v. Spence, 17 N.J. 162, 167 (1954); Rothman v. River Edge, 149 N.J. Super. 435, 440-441 (App. Div. 1977). Judgment for the tax year 1972 should be entered in conformity with the ultimate judgment to be entered for the tax year 1971.

III
In its initial petitions to the Division petitioner failed to allege discrimination in any of the years under appeal with the exception of 1969 and assessments of $52,500[7] *53 and $6,600[8] in the year 1974. It sought to correct the deficiency by filing with the Division on February 10, 1975, three weeks before commencement of the plenary hearing in the Division on the consolidated appeals of petitioner and Perth Amboy, amended petitions alleging discrimination in all years under appeal. The Division judge refused to allow the amendment for the years prior to 1971 but did consider the claim of discrimination for the years 1971, 1973 and 1974. In light of this court's previous holdings on the subject, the Division should have properly rejected each of the amended petitions which alleged discrimination for the first time. The amendment stating this new cause of action should have been pleaded within the time allowed for an appeal. See N.J.S.A. 54:2-39.
As the court observed in Hackensack Water Co. v. North Bergen Tp., 8 N.J. Super. 139 (App. Div. 1950):
While the language employed by the Legislature [in N.J.S.A. 54: 2-40.2] is most comprehensive, the amendments [to petitions of appeal to the Division] that may properly be made are not unrestricted. It is a principle of wide application that an amendment setting up a new cause of action should not be permitted after the time has expired for bringing the suit or other proceeding. [at 142]
See also, Cleff Realty Co. v. Jersey City, 41 N.J. Super. 465, 470-471 (App. Div.), certif. den. 23 N.J. 58 (1956); Matawan v. Tree Haven Apartments, Inc., 108 N.J. Super. 111, 116 (App. Div. 1969); Continental Paper Co. v. Ridgefield Pk., 122 N.J. Super. 446, 449 (App. Div.), certif. den. 63 N.J. 328 (1973).
Beyond this, the proofs adduced before the Division on these consolidated appeals were obviously inadequate to sustain a claim of discrimination. See In re Appeals of Kents 2124 Atlantic Ave., Inc., 34 N.J. 21 (1961); Tri-Terminal Corp. v. Edgewater, 68 N.J. 405 (1975), cert. den. 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976). *54 Here, as in Tri-Terminal, the taxpayer failed "to show that, relative to the generality of other assessed real property in the municipality, its property is being assessed on a less favorable basis." 68 N.J. at 411-412. In short, it has not met the Kents criterion, viz., "A taxpayer who seeks a reduction of an assessment below true value must prove that his share of the total tax burden substantially exceeds the share allocated to others generally." 34 N.J. at 33. And see, Tri-Terminal, supra, 68 N.J. at 412.
In light of the failure of proof to support the claim of discrimination, we find no need to comment on the impact of the revaluation of the assessed properties in the municipality, made by an independent appraisal firm, effective for the tax year 1971. Cf. Piscataway Assoc., Inc. v. Piscataway Tp., 73 N.J. 546, 551-552 (1977); Tri-Terminal Corp. v. Edgewater, supra, 68 N.J. at 411-412. We are, however, satisfied that there is no merit in petitioner's suggestion that little, if any, weight is to be accorded the revaluation since the record is "replete" with "competent evidence" showing discrimination. The Division's denial of discrimination relief was, in the circumstances, proper.

IV
Perth Amboy argues on its cross-appeal that the Division erred in ruling that much of the process equipment and support facilities was not assessable as real property under the criteria set forth in National Lead Co. v. Sayreville, 132 N.J. Super. 30 (App. Div. 1975). We agree. It is obvious that the Division judge mistakenly assumed that if equipment could be removed from a building without material physical harm to it or the building, it must be considered as personalty and thus not taxable as part of the realty.[9] This is not the applicable law. In National Lead *55 Co. v. Sayreville, supra, we concluded that
* * * whenever machinery and equipment have been placed in or annexed to a structure to carry out the purposes for which the structure was erected or designed or to which it has been adapted, with the intention to remain there permanently, and the removal thereof will result in material injury as defined hereinabove,[10] such machinery and equipment become part of the realty. The test here is the essentiality of the chattels to the use for which the building was designed or used.
[132 N.J. Super. at 40; emphasis supplied]
See also, Fahmie v. Nyman, 70 N.J. Super. 313 (App. Div. 1961).
Tested by this criterion, the electrolytic tanks and overhead cranes contained in tank house #2, building #11 and tank house #1, building #65, should clearly have been valued and assessed as real property. A remand to the Division for proper valuation and assessment of these items is required. Additionally, the Division is, on the remand, to review the remainder of the items on the "Refinery Equipment List" of Exhibit R-9 in evidence which were not previously treated as realty, and determine which of these meet the above-quoted standard of National Lead. The Division is to determine the value of those which satisfy the *56 test and fix the assessments accordingly.[11] For the tax year 1971 the Division is to enter amended judgments increasing the amount of the assessments fixed by it for said year in its judgments of December 15, 1975, to reflect the value of the machinery and equipment included on the remand as real property.[12] For the tax year 1972, the Division is to enter amended judgments in conformity with the amended judgments to be entered for the tax year 1971. For the tax years 1973 and 1974, the Division is to enter further amended judgments increasing the amount of the assessments fixed by it for said years in its amended judgments of August 5, 1976, to reflect the value of the machinery and equipment included on the remand as real property,[13] the total assessments for these years not to exceed the original Perth Amboy assessments.
In summary, we hold that (1) the Division's determination to allow the 12 1/2% decrease for obsolescence was proper; (2) the Division erred in not applying the Freeze Act (N.J.S.A. 54:2-43) to the tax year 1972, and judgment for that tax year should be entered by the Division in conformity with the ultimate judgment to be entered for the tax year 1971; (3) the taxpayer was properly denied the discrimination relief sought; (4) the Division erred in failing to value and assess as real property certain of *57 the process equipment and support facilities summarized in Exhibit R-9 in evidence.
Accordingly, we affirm the judgments of the Division of Tax Appeals for the years 1968, 1969 and 1970, and remand the remaining matters to the Division for further proceedings consistent with this opinion, including the entry of appropriate amended judgments for the years 1971, 1972, 1973 and 1974, all of which is to be concluded within 90 days from the date hereof. We do not retain jurisdiction.
NOTES
[*] Substituted as attorneys for petitioner-appellant following the filing of the notice of appeal.
[1] Which extended over a period of 15 nonconsecutive days, beginning March 3 and ending July 29, 1975.
[2] The Raritan Copper Works, as the refinery was known.
[3] The figures shown in this column include the following amounts for processing equipment and support facilities: $23,266,000 for 1968; $23,499,000 for 1969; $24,429,000 for 1970; $25,593,000 for 1971 and $26,523,000 for 1972.
[4] The figures shown in this column include the following depreciated values for the above mentioned processing equipment and support facilities: $7,880,000 for 1968; $7,959,000 for 1969; $8,274,000 for 1970; $8,668,000 for 1971 and $8,983,000 for 1972.
[5] Rounded.
[6] During each of the three years Perth Amboy assessed the land and improvements at 50% of true value, the county ratio at the time, resulting in the following assessments: land at $289,470 and improvements at $1,379,390, for a total of $1,668,860. Thus, the full value to which the 50% ratio was applied was $578,940 for land and $2,758,780 for improvements, making a total of $3,337,720  an amount substantially below the total valuations arrived at by the Division judge.
[7] Assessment of property in Block 14, lot 1A, as follows: land ... $32,500; improvements ... $20,000; total ... $52,500.
[8] Assessment of land only in Block 37, lot 1.
[9] In his original written opinion he said:

The articles this court finds are real estate are such that their removal would definitely result in some degree of damage to themselves as well as the building they are situated in.
[10] I.e., that "which `will prevent the structure from being used for the purpose for which it was erected or for which it has been adapted.' * * * This is the so-called institutional doctrine of fixtures:

Basically, the applicability of the rule depends upon the presence of proof in the individual case which impels the conclusion that the chattels in question are permanently essential to the completeness of the structure or the use to which the structure is put. This established, mode of annexation fades in significance, adaptability inheres in the proofs, and the intention of permanent accession to the freehold is inferred. [Fahmie v. Nyman, supra, at 318-319.]."
[132 N.J. Super. at 39].
[11] In regard to the items of machinery and equipment which the Division previously treated as realty, we find no basis for disturbing the Division's acceptance of the taxpayer's estimate of the value of these items, there being sufficient evidence in the record to support the same.
[12] The electrolytic tanks and overhead cranes contained in tank house No. 2, building No. 11 and tank house No. 1, building No. 65, and those remaining items on the "Refinery Equipment List" of Exhibit R-9 which the Division determines meet the above-quoted National Lead standard, except the machinery and equipment which the Division previously treated as realty and for which values are already included in the pertinent judgments under review.
[13] The same as footnote 12.