LARIO, J.T.C.
Plaintiff has appealed from judgments of the Burlington County Board of Taxation affirming 1981 and 1982 local property tax assessments for premises located on Route 130, Edge-water Park Township and listed on the tax map as Block 404, Lot 2-C. Plaintiff complains that the assessments for the two years are both above true value and discriminatory. The judgments appealed from are as follows:
1981 Tax Year
Land $306,000
Improvements 200,600
Total $506,600
*173 1982 Tax Year
Block 404, Lot 2-C Land $260,700
Improvements 200,600
Total $461,300
Block 404, Lot 2-C-l Land 45.300
Improvements -0-
Total 45.300
Prior to October 1, 1981 title to 1.5 acres of the land under appeal was conveyed; however, it was agreed that the transfer was internal with no change in equitable ownership. For the tax year 1982, although the subject property had two separate land assessments because of the conveyance, the total assessment of $506,600 remained the same as the prior year.
It was stipulated that the land and improvements for both tracts be valued as a single unit for 1982 and that the value for both 1981 and 1982 was identical.
Plaintiff alleges that the true value of the subject property is $365,000 to which is to be applied a ratio of 82.5% thereby entitling it to a reduced assessment of $301,125. Defendant contends that the true value is $770,800 and by application of the municipality’s assessment ratio, which the assessor stated to be 77%, the correct assessment is $593,500.
The property under appeal is a one-story masonry and steel building occupied as a Chrysler/Plymouth automobile agency located on the west side of Route 130, approximately 1,000 feet from Beverly-Bridgeboro Road. The site is level at road grade and is zoned B-l commercial. The land, which was agreed to be 7.56 acres, is rectangular in shape; has 750 feet frontage on Route 130, with sidelines of 497.76 and 384.67 feet respectively. The building contains 23,358 square feet which was constructed in two stages; the main building constructed approximately 19 years ago and a 20 by 30 foot addition that was constructed in 1976. The building is free-standing with a showroom and office in the front portion occupying approximately one-third thereof *174 while the remainder to the rear is used as an automobile-repair, service and parts area. It is constructed mainly of concrete block and steel on a foundation of concrete-slab without a basement. The interior contains panelled walls, acoustical-tile ceilings and asphalt-tile floors in the office area; concrete block, plate-glass and metal-sash finish with carpeted floors in the showroom area, and painted concrete block walls with unfinished ceiling and concrete floor in the repair area. There are three bathrooms, one each for men and women in the office area and the third is a large washroom in the shop area. The plumbing consists of two slop sinks, eight wall closets, six lavatories and four urinals. The property has a space heater for the office area and central heating and air conditioning systems for the office and showrooms. There are 13 overhead-type garage doors in the shop area, plate-glass and metal doors in the showroom area and wooden interior doors for the offices. Surrounding the building is approximately 62,000 square feet of parking area covered with asphalt paving, lighted by 14 outside light systems.
Plaintiff’s expert testified that during the last three years he has appraised approximately 100 automobile showrooms owned by Chrysler Corporation and by Ford Motor Company located throughout the northeast and in so doing he has had an opportunity to inspect and familiarize himself with their leases. He stated that the subject property is a typical new automobile dealer building which is basic in design, size and construction, i.e., a glass-enclosed showroom in front, with offices to the rear of the showroom and a parts department, service and repair area in the rear of the building. He stated that these type buildings are usually between 17,000 and 25,000 square feet with the average size being about 20,000 square feet while the average land size is about three acres. It was his opinion that this is a special-purpose-type building, basically a “warehousing-type of operation with some service” and that the only other use would be for some raw-warehousing-type of business after some alterations to provide security.
*175 He stated that the square-foot-unit-rental value utilized by him in his income approach was obtained by reviewing eight dealership leases located in southern New Jersey. The eight properties were located in East Brunswick, Middlesex County; Cinnaminson, Burlington County; Cherry Hill, West Collingwood and Stratford, Camden County; Woodbury, Gloucester County; Vineland, Cumberland County; and Atlantic City, Atlantic County. He testified that the leases ranged from $1.57 a square foot for the Vineland property to $4.32 a square foot for the one in Woodbury. He further stated that the average range is normally $2.50 to $3 a square foot for improvements approximating the size of the subject property. The improvements of the eight leases he relied upon ranged in size from a low of 13,694 square feet to the subject’s 23,300 square feet, which was the largest, and their acreage was 1.95 acres for the smallest with the subject’s 7.5 acres being the largest. He further stated that the average overall dimensions of the eight comparables was 17,977 square feet for buildings and 3.81 acres for land.
The average annual rental for his comparables was $51,740 a year, which, based upon an average of 17,977 square feet, came to an overall average of $2.87 a square foot. However, based upon his •'erience of examining many auto agency leases he thought that e average rental is just a little over $2.50 a square foot. Instead of utilizing either of the above averages as his economic rent, he used the subject lease’s actual rent of $1.68 a square foot as the economic rent giving as his reasons what he alleged to be the poor economic conditions that generally existed in 1980 when the lease was executed and the declining sales of new automobiles during this period of time.
He estimated the rental value of the personal property to be $7,136 which he deducted from the gross rent arriving at an effective annual gross income of $40,000. He valued the land at $264,000 which he capitalized at 10%, thereby charging $26,400 of the income to the land. He then deducted this latter sum from his effective gross income to arrive at a net income of $13,600 attributable to the building. He capitalized this net income at an overall capitalization rate of 13.5% (safe rate — 7%, *176 risk rate — 2%, liquidity rate — 1.5%, management rate — .5% and recapture rate — 2.5%), thereby arriving at a value of $100,741 for the building. Adding back his land value of $264,000 gave him a true value of $364,741 which he rounded to $365,000. He then concluded that-the assessed value was $301,125 based upon an alleged equalization rate of 82.5%.
In defense of its assessment, the municipality presented the testimony of its assessor who valued the property solely by way of the market approach. In arriving at his true value this expert relied upon four sales. He calculated the square foot price for the buildings in the sales to be $51.50, $46.59, $38.56 and $38.24 respectively. After making adjustments for dissimilarities he arrived at adjusted sales prices ranging from $32.61 a square foot to $34.42 a square foot and he concluded thereby a value of the subject property of $33.00 a square foot. Multiplying this unit value by the subject property’s 23,358 square feet, resulted in his true value of $770,800. He then applied thereto 77%, which he testified was his 1982 ratio, to arrive at his assessment value of $593,500.
Real property is assessed locally as required by N.J.S.A. 54:4-23 which directs that the assessor shall “determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract....” Full and fair value is the equivalent of true value, also referred to as market value. Newark v. West Milford Tp., 9 N.J. 295, 303, 88 A.2d 211 (1952). In these appeals the parties disagree as to what that true value is for the subject property. Most appraisers rely on three basic approaches to estimate the true value of real estate. Here, to arrive at their respective opinions of true value, each of the two experts has presented a single, but conflicting, method.
For many years, it has been generally accepted appraisal practice to use three separate approaches to real estate value, commonly known as the Market or Comparison Approach, Income or Earnings Approach, and Cost Approach. These three approaches were developed through the experience of professional appraisers, and have received the support of leading national appraisal organizations. Theoretically, each of these approaches is a method or technique based on *177 factual data, presumably extracted from the market by which an appraiser evolves separate indications of market value, to be correlated, reconciled, and weighed in order to reach a final estimate of value. [Friedman, Encyclopedia of Real Estate Appraising, (3 ed. 1978) 9, 10]
However, our courts have stated on numerous occasions that there can be no rigid rule nor particular formula utilized in determining the fair value of property, i.e., the price for which a property will sell between parties willing but not compelled to sell or buy, as the case may be; the answer depends upon the particular facts and the reaction to them of experts steeped in the history and hopes of the area. New Brunswick v. Tax Appeal Div., 39 N.J. 537, 543-544, 189 A.2d 702 (1963); Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 72, 208 A.2d 153 (App.Div.1965). In the instant case the income approach alone was used by plaintiff’s expert and the market approach solely by defendant’s expert.
The law is well settled in this State that on appeal to the county board, “there exists a presumption in favor of the quantum of the tax assessment made by the local taxing authority and the burden is on the taxpayer to prove otherwise.” Riverview Gardens v. N. Arlington Borough, 9 N.J. 167, 174-175, 87 A.2d 425 (1952). A similar presumption attaches to the judgment of the county board on further appeal to the Tax Court. Rodwood Gardens, Inc. v. Summit, 188 N.J.Super. 34, 38, 455 A.2d 1136 (App.Div.1982).
This latter presumption stands until the county board determination is shown to be erroneous by sufficient competent evidence to the contrary. [Passaic v. Botany Mills, 72 N.J.Super. 449, 454, 178 A.2d 657 (App.Div.1962), certif. den. 37 N.J. 231, 181 A.2d 13 (1962) ].
“Such evidence must be definite, positive and certain in quality and quantity to overcome the presumption.” Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 105, 89 A2d 385 (1952).
Plaintiff’s total proofs consist of the testimony of its expert plus his written appraisal which contains a copy of the lease for the subject property. I conclude that the evidence submitted by plaintiff is deficient for the following reasons.
*178 Plaintiff’s expert claims that the subject property is a special purpose building; however, he has failed to present facts to support his bare conclusion. The property is a free-standing, one-story building with office space in the front and a large spacious garage to the rear. He has not set forth any facts to establish why the property cannot be utilized for light-industrial uses or commercial businesses; on the contrary, the property appears to be well-suited for these uses. It is a modern, one-story building with a very functional office and commercial area in the front. The large garage area has 13 overhead garage doors which permit this rear space to be used for many types of operations. It is heated and air conditioned throughout with adequate plumbing and sanitary facilities. The unit has an ample parking area with several additional acres for expansion. It is easily accessible being located on a major New Jersey highway mid-way between the Trenton and Philadelphia metropolitan areas. I find that the property is readily adaptable to many other commercial and light industrial uses; therefore, it is not a special purpose building. See Sunshine Biscuits, Inc. v. Sayreville, 4 N.J.Tax 486, 496-497 (Tax Ct.1982).
Additionally, if the subject property were a special purpose building, the reproduction approach to value should have been considered and its result “correlated, reconciled and weighed in order to reach a final estimate of value.” Encyclopedia of Real Estate Appraising, supra at 9-10; Compare Anaconda Company v. Perth Amboy, 157 N.J.Super. 42, 384 A.2d 531 (App.Div.1978), certif. granted on other grounds 81 N.J. 55, 404 A.2d 1155 (1979), where our Appellate Division held: “[T]he only proper appraisal approach for evaluating [a building which is special purpose in nature] was the cost approach.” At 157 N.J.Super. 46, 384 A.2d 531.
Despite his conclusion that the building is special purpose in nature, plaintiff’s expert completely ignored the cost approach and instead considered only the income approach to arrive at his final opinion of true value.
*179 The “income approach” reflects the value of a property’s earning power based upon a capitalization of income. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) 42.
An investor who purchases income-producing real estate is essentially trading a sum of present dollars for the right to receive future dollars. The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses when analyzing a property’s capacity to generate monetary benefits and when converting the benefits into an indication of present value. [Id. at 333]
In the income approach the first problem is to find the net rental value to which the capitalization rate will be applied. There is no doubt that for ad valorem tax purposes economic rent, also referred to as fair market rental, if it differs from actual or contract rent, must control in the income approach to value. New Brunswick v. Tax Appeal Div., supra 39 N.J. at 544, 189 A.2d 702.
To determine whether contract rents actually reflect economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitors’ area. After a sufficient number of comparable properties are properly analyzed, a basis for a reliable rent schedule for the subject property may be made. Parkview Village Assoc. v. Collingswood Boro., 62 N.J. 21, 29-30, 297 A.2d 842 (1972).
The elements of comparison are conditions of rental (arm’s-length lease terms), market conditions (time), location, and physical and income characteristics as provided in the lease. Rents for comparable properties can be analyzed and adjusted for differences in these categories to develop a market rent estimate for the subject property.
The extent of data required to support an estimate of market rent for a subject property depends on the complexity of the problem, the availability of closely comparable rentals, and the extent to which the pattern of adjusted rent indications derived from the comparables varies. [The Appraisal of Real Estate, supra, at 359.]
In attempting to arrive at the rental value for the subject property, plaintiff’s expert relied upon eight leases all of which were similar to the subject lease, i.e., they were properties owned by automobile manufacturers and leased to dealers engaged in the sale of the landlord’s products. He arrived at his *180 alleged fair market rentals merely by dividing the annual rentals as set forth in the respective leases by that building’s square footage. Neither the leases nor their rentals were mentioned or referred to in his written report nor were the leases placed in evidence. In his oral testimony concerning the leases [1] he failed to set forth all of the terms of the leases, descriptions of the leased premises and their physical condition, and what, if any, personal property was included in the consideration. The result of this expert’s comparison of these eight leases was nothing more than a mathematical computation whereby he arrived at an average square foot rental of dealership space generally; it was not an expert appraisal of the respective comparable properties’ fair market rentals adjusted for differences to reflect an economic rent for the subject property. Mathematical calculations in appraisals should be closely scrutinized. Kearny v. Tax Appeal Div., 137 N.J.L. 634, 637, 61 A.2d 208 (Sup.Ct.1948), aff’d 1 N.J. 409, 64 A.2d 67 (1949).
After having arrived at his average comparable rental of $2.87 a square foot, he, without supporting data, reduced it to $2.50 a square foot based upon his alleged experience. Where an expert gives an opinion of value based on his experience without supporting such value by specific data, his opinion is not entitled to any probative value. Berkeley Develop. Co. v. Berkeley Heights Tp., 2 N.J.Tax 438, 444 (Tax Ct.1981). He then stated that the contract rental of the subject property, which he calculated to be $1.68 a square foot, was the subject property’s economic rent. His explanation was that in 1980, when the subject lease was executed, economic conditions were generally poor and during this period sales of new automobiles were declining. How he adjusted these negative factors to reduce his average market rental of $2.50 a square foot to $1.68 a square foot, a reduction in excess of 32%, was not demonstrated nor justified. The weight to be given to the opinions of experts *181 depends especially upon the facts and reasoning which are the foundation thereof. In re Port of New York Auth., 28 N.J.Super. 575, 581, 101 A.2d 365 (App.Div.1953), Delaware, L. & W. R.R. Co. v. Hoboken, 16 N.J.Super. 543, 562, 85 A.2d 200 (App. Div.1951).
Although “actual income is a significant probative factor in the inquiry as to economic income,” Parkview Village Assoc., supra 62 N.J. at 30, 297 A.2d 842, sound appraisal judgment requires that all of the terms and conditions of the contract lease be carefully examined and considered to determine whether it reflects economic income.
If the property has been leased and rental is to be paid pursuant to the lease agreement, each clause of the contract must be analyzed carefully. The appraiser must search for significant provisions of the lease agreement which may affect value; particularly the duration of the lease, rental payments, and the rights and obligations of the lessor and lessee. [Encyclopedia of Real Estate Appraising, supra at 42; ■ emphasis supplied]
The subject lease contains the following clause:
TERMINATION 29. Without limiting the rights or powers of cancellation of the Lease as provided elsewhere herein, this Lease may be cancelled at any time at the option of the Landlord if Tenant ceases to be an authorized Direct Dealer for Chrysler Corporation products at the demised premises as a result of a termination of the Direct Dealer Agreement with Chrysler Corporation or any subsidiary of Chrysler Corporation, unless Tenant and Chrysler Corporation or a subsidiary of Chrysler Corporation enter into an immediate superseding Direct Dealer Agreement for Chrysler Corporation products at the demised premises. Landlord shall notify Tenant in writing of its election to treat this Lease null and void hereunder. Thereupon, cancellation of this Lease will be effective on the last day of the month in which this notice is mailed, at which time this Lease shall terminate as though said date were originally fixed for the termination and expiration of this Lease.
Tenant agrees that in the event, without the written notice of the Landlord, the demised premises shall become and remain vacant or not used for the sale of Chrysler Corporation products for a period of ten (10) days while the same are suitable for such use by Tenant, ... [the landlord may enter, expelí the tenant and terminate the lease].
In The Appraisal of Real Estate, supra market rent is defined as “... the rental income that a property would most probably command in the open market as indicated by current rents being paid and asked for comparable space as of the date of the appraisal.” At 352; emphasis supplied.
*182 It is obvious that this lease is not a lease executed between parties in the open market but, in effect, is in the nature of a franchise lease dictated by the landlord.[2] A manufacturer of automobiles who is also the owner of a building leased to its authorized dealer for the specific purpose of selling its products, is not a typical real estate owner who is engaged in the business of securing a financial return on its real estate investment; Its ownership of a retail outlet and the subsequent creation of a landlord-tenant relationship is merely incidental to its primary business which is the distribution and sale of its automobiles. As the Appellate Division observed in Fort Lee v. Hudson Terrace Apts., 175 N.J.Super. 221, 417 A.2d 1124 (App. Div.1980), certif. den., 85 N.J. 459, 427 A.2d 559 (1980): “... the focus must be on the value of the property in the market place, without regard to the particular or peculiar circumstances of the owner.” At 175 N.J.Super. 226, 417 A.2d 1124. This type of lease is not a freely negotiated arm’s-length transaction; therefore, it cannot be relied upon as providing rents typical in the market.
Upon cross-examination of this expert, it was developed that there were several properties owned by non-auto manufacturers and leased to unrelated auto dealers in close proximity to the subject property; however, this expert did not consider their leases in his analysis. His acceptance of subject’s contract rent as economic rent without supporting it by comparable rents freely negotiated in the open market between independent landlords and tenants is defective. I conclude that plaintiff has failed to prove that either the comparable rentals utilized by him or the contract rent of the subject property constitutes the fair rental value of the property as of the assessing dates herein.
Nevertheless, had plaintiff established a fair market rental, its proofs are still insufficient to meet its burden of proof. His *183 mathematical calculation of the square foot contract rent is also erroneous. The subject property’s ten-year lease sets forth a total consideration of $436,320 in monthly installments of $3,861. This calculates to an annual rental of $46,332; however, in his appraisal report this expert used $47,136 as his gross annual rent without explanation. He then deducted $7,136 for the rental value of the machinery without any proof that this figure represented the fair rental value thereof.
Plaintiff’s expert valued the land at $264,000 which he capitalized at 10%; however, he submitted no comparable sales or any other factual data to support his conclusion of land value. When using the building residual technique, an appraiser assumes that the land value can be estimated independently. The Appraisal of Real Estate, supra at 395-396. A taxpayer must establish the true value of his land value by independent proof. Reading Co. v. Woodbridge Tp., 45 N.J. 407, 429, 212 A.2d 649 (1965). He then capitalized his income attributable to the improvements at 13.5%, which did not include a tax rate since it was a neb-net lease. This rate was based upon interest rates as reported September 11, 1981 in the Wall Street Journal. These reported rates were confined strictly to certificates of deposit, prime rates, commercial paper, etc., but do not in any way indicate the rate of return reasonably anticipated by investors in real estate within this area at this time. Such published statistical material is useful for investments in the money market but it is not necessarily indicative of the capitalization rate for real estate which is not so readily ascertainable. Such a demonstration has not been made here. Murnick v. Asbury Park, 2 N.J.Tax 168, 187 (Tax Ct.1981), rev’d on other grounds 187 N.J.Super. 455, 455 A.2d 504 (App.Div.1982); Middlesex Builders v. Old Bridge Tp., 1 N.J.Tax 305, 311-313 (Tax Ct.1980). Other than his recapture rate of 2.5% which he based upon an estimated remaining life of 40 years, there was no proof to support his conclusion for either his land or improvement capitalization rate.
Plaintiff’s expert in the instant case failed to heed
... the precautionary note sounded by the Chief Justice in the seminal case in this field—New Brunswick v. State of N.J.Div. of Tax Appeals, 39 N.J. 537, 544 *184 [189 A.2d 702] (1963) — as to the “care with which the income method must be used” and “that one should hesitate to accept its answer without checking against all available data.” [Parkview Village Assoc. v. Collingswood, supra, 62 N.J. at 24, 297 A.2d 842]
It is abundantly clear that plaintiff has failed completely to meet its burden of proof.
This matter having been fully litigated and defendant’s expert having testified that the assessable value is in excess of the original assessment, its proofs must be examined to ascertain whether there is sufficient credible evidence from which a determination can be made for an assessable value in excess of the county board’s judgment. Rabstein v. Princeton Tp., 187 N.J.Super. 18, 453 A.2d 553 (App.Div.1982); Samuel Hird & Sons, Inc. v. Garfield, supra. Where the municipality seeks to increase the assessment entered by the county board, it has the burden of ultimate persuasion to upset the county board’s judgment. Passaic v. Botany Mills, supra 72 N.J.Super. at 454, 178 A.2d 657.
In arriving at his true value of $770,800 defendant’s expert relied upon the market approach. The market approach arrives at the value indicated by recent sales of comparable properties in the market. This method of analysis rests primarily on a comparison of the subject property with other sufficiently similar properties which have been sold recently. In the process of comparison an appraiser must consider in which respects the properties are similar and in which respects they are dissimilar, and make adjustments in either dollars or percentages to account for those differences. Encyclopedia of Real Estate Appraising, supra at 21-38.
In all four sales relied upon by the assessor both the sellers and buyers were new automobile dealers. At the time of sale each dealership was being actively operated and the business so continued after the sale. All of the sale properties were located in municipalities outside of Edgewater Park. The assessor secured all his information relative to the sales from the files of the respective assessors’ offices; however, as to the fourth sale, he also saw a transcript of the deed. He was not familiar with *185 the terms of any of the sales nor what, if any, business assets were included in the transfers.
The first sale included a purchase-money second mortgage for more than 50% of the purchase price at 10% interest for a 15 year term with amortization based on 25 years. Three-quarters of the consideration of the fourth sale was financed by a ten-year 7% purchase-money mortgage held by the grantor. This expert did not analyze nor make any adjustments for these mortgages in comparing the sales to the subject property nor did he familiarize himself with the financing involved in the other two sales. He did not describe nor evaluate the dissimilarities or physical characteristics of the respective properties. The only adjustments made were unsupported minus-adjustments for location and condition of the property and a plus 5, 10 and 15% time adjustment for three of the properties without any factual data or explanation as to how or why he arrived at these various percentages. “If the bases for the adjustments are not made evident the court cannot extrapolate value.” Inmar Associates, Inc. v. Edison Tp., 2 N.J.Tax 59, 66 (Tax Ct.1980).
In attempting to utilize the market approach to value the assessor committed the same error as plaintiff’s expert in that he merely made a mathematical computation without fully analyzing each sale. This court is required to weigh and appraise the factors surrounding a sale to determine whether there were special circumstances which had a tendency to increase or depress the sales price. Rek Investment Co. v. Newark, 80 N.J.Super. 552, 560, 194 A.2d 368 (App.Div.1963). This determination cannot rest upon a formula based on sales volume or gross sales, McCrory Stores Corp. v. Asbury Park, 89 N.J.Super. 234, 240-241, 214 A.2d 526 (App.Div.1965), nor may it be based upon a sale that includes good will. “A parcel of real estate that supports a business may have a value in excess of the contribution made by its tangible assets. This value, going concern value, includes good will.” The Appraisal of Real Estate, supra at 612.
*186 Where, as here, the seller and buyer were new car dealers for the same type of automobile and after the sale, the business continued uninterrupted, an inference is drawn that the sale included both real estate and business. The burden of proof is upon the proponent of the sale’s use as a comparable to establish that the consideration was solely for real estate; or, in the alternative, the value of the real estate portion of the sale.
The real estate component of this type sale consists of such factors as size of the land, its location, access and visibility; neighborhood and surroundings; and the size, design, quality, utility, function and layout of the improvements; whereas, the business portion includes the type, quality and sales volume of the motor vehicles, fixtures, equipment and other personal property, management expertise and ability of personnel, if any are retained, the value of manufacturer-approved dealership; and existing good will.
Defendant’s expert failed to fully examine and analyze any of the sales and failed to establish that the sales prices reflected solely the value of the real estate.
In the comparison test it must be remembered that evidence of comparable sales is effective in determining market value only where there is a substantial similarity between the properties so as to admit of reasonable comparison. Berkeley Develop. Co., supra at 443. Since the conclusion of value by defendant’s expert is based on insufficient data, it is rejected. An expert’s opinion rises no higher than the data on which it is formed. Passaic v. Botany Mills, supra; Herman Holding Corp. v. Montvale, 5 N.J.Tax 199 (Tax Ct.1983).
I conclude that neither plaintiff nor defendant has presented sufficient, competent evidence, as required by Aetna Life, supra, to overcome the presumption of correctness that attaches to the county board judgments entered in this matter nor are there sufficient facts from which a finding of true value can be extrapolated.
*187 Inasmuch as neither party has submitted competent proof to establish the true value of the subject property, the issue of discrimination is not properly before this court, Rodwood Gardens, Inv. v. Summit, supra, therefore, it is not necessary to determine which of the two ratios submitted is correct.
Judgment will be entered dismissing the appeals.

 Although R. 8:6-1 (b) was not complied with by plaintiffs failure to include in its appraisal report the relevant lease terms of the comparable rentals, no objection was made to the admission of this testimony.

The comparable leases referred to by plaintiffs expert were also between automobile manufacturers and their dealers; however, since the leases were not placed in evidence, it cannot be determined if they contained similar cancellation clauses.