KAHN, J.T.C.
This is the court’s determination with respect to a trial on the sole issue of whether or not defendant’s (municipality) increase of plaintiffs (taxpayer) local property tax assessment from $217,000 to $308,400 for 1998 was the result of unconstitutional spot assessment.
The subject property consists of a one-family house. Taxpayer filed a small claims complaint in the Tax Court for the tax year 1998. Prior to the scheduled October 12,1999 trial date, taxpayer mailed a letter notice in lieu of subpoena for the production at trial of the tax assessor and certain documentary evidence. The municipality responded with a motion, returnable on the trial date, to quash the notice in lieu of subpoena. On October 13, 1999, taxpayer appeared with counsel and contested the motion to quash. The trial court granted the motion, and over taxpayer’s objection, permitted the trial to proceed on the issue of valuation only, denying taxpayer the opportunity to seek redress based upon spot assessment. The Tax Court upheld the 1998 assessment ($308,400), and taxpayer appealed. The Appellate Division found that the Tax Court erred in (1) failing to permit taxpayer to litigate the issue of “spot assessment,” and (2) failing to permit taxpayer to obtain discovery of the assessor’s records, and (3) not permitting taxpayer to depose the assessor. The matter was remanded to the Tax Court,[1] after which the discovery issues were resolved. This court conducted a trial, in which taxpayer sought to demonstrate that:
1. Reassessment, in general, should be deemed unconstitutional;
2. The municipality's reassessment program should be deemed unconstitutional and not in compliance with N.J.A.C. 18:12A-1.14; and
3. The municipality’s reassessment of the subject property was a specific spot assessment.
*622 The subject property is located at 591 Mine Brook Road in Bernardsville Borough, also known as Block 90, Lot 9. Taxpayer contracted for the purchase of same in August 1997, having negotiated terms prior thereto, and having considered properties other than the subject. In December 1997 (subsequent to October 1, 1997), taxpayer completed the purchase of the subject property for $312,000.
Taxpayer testified that during the summer of 1997, with respect to the subject and the other properties that she examined, she frequently visited the assessor’s office to check assessments. Taxpayer acknowledged never having spoken to Mrs. Sudano, the assessor for the municipality, but did speak to other individuals working in the assessor’s office. Taxpayer contends that the assessor ultimately increased her assessment from $217,000 in 1997 to $308,400 in 1998 for no other reason than the assessor’s alleged awareness of taxpayer’s contract to purchase the subject property for $312,000.
Taxpayer relies upon the testimony of the assessor, called as taxpayer’s witness. The parties agreed, however, that direct examination would be conducted by the attorney representing the municipality, and cross-examination would be conducted by taxpayer’s attorney.
The assessor testified that, upon appointment to the Bernards-ville assessor’s position in 1989, she proceeded to implement a policy of assessment maintenance, with the consent of the municipal governing body, to be performed on an annual basis. She first established a computerization program in conformity with the New Jersey State Manual for Property Assessment to assist in annual reassessment. MGM Associates (MGM) was engaged to implement the program. The assessor supervised MGM in establishing neighborhood delineations consisting of dividing the municipality into vector control segments (VCS), which are neighborhoods based on similarity of properties. All properties were inspected in this process. Each year, a proposed assessment maintenance program would be submitted to the Somerset County Board of Taxation, and ultimately to the New Jersey Division of Taxation. *623 For all of the years, including, but not limited to 1998 and thereafter, the county board, as well as the Division of Taxation, approved and executed the assessment maintenance program submitted by the assessor.[2] A review of the testimony indicates that, during the years, up to and including 1998, representatives, including field inspectors, actually inspected onsite at least 33% and up to 38% of all properties in the municipality. During the years when the hilly areas of the municipality were undergoing inspection, the number of inspected line items might have been fewer than the number inspected in other years. The assessor indicated, however, that in no event were fewer properties inspected than were set forth on the approved reassessment plan.
For 1998, the assessor indicated that she performed the same type of analysis as in all preceding years. This consisted of reviewing all 2,863 line items. With respect to Class 2 items (residential), all 1816 line items were reviewed, resulting in changes to 1284. She reviewed all property record cards and construction permits for renovations and alterations. As to the 38% of the properties physically inspected, she received inspection reports. These reports were kept on the original printout sheets given to the inspector prior to making each inspection.
For 1998, as she did in the preceding years, the assessor conducted a resale analysis. She estimated that approximately 300 properties were sold each year, and, along with available listing information, she would conduct a study for each VCS, as well as for the municipality at large. This exercise results in ratios of assessment to sale price. The ratios are averaged, and *624 the difference between the average (mean) and each ratio is determined. The differences are totaled and divided by the total number of sales, resulting in an average difference (deviation) from the norm. Dividing the average deviation by the average ratio results in a coefficient of deviation. This process, according to the assessor, was utilized to determine the degree of uniformity in ratios of assessments to sales within each specific VCS and for the municipality as a whole. The ultimate goal was, as she described, to have all properties in the municipality assessed at 100% of true value. She acknowledged not being able to achieve 100%, but managed close to 95%.
With respect to the subject property, the witness testified that, during the reassessment process, she was unaware that the property was marketed and ultimately sold, in December 1997. She became aware of the sale subsequent to completion of the municipality-wide reassessment process. She also testified that although she occasionally drove by the subject property, she never saw a “For Sale”' sign, contrary to the taxpayer’s testimony, which indicated that a Weichert Real Estate sign had been in front of the subject property during all months prior to October 1, 1997. The assessor testified that the sale price was not a factor in the reassessment of taxpayer’s property, but if she had been aware of the impending sale, she might have used that listing or contract price as part of her comparable sales analysis.
The assessor testified that, in June or July 1997, she printed out an “impact study” which set forth the details of each property. The sheet containing the subject property also contained details of other properties. She noticed that the subject’s 1997 assessment was lower than others in the area, indicating an effective age of 1960, with an assessment of $217,000. The sheet also contained number of rooms and square footage. The assessment was not, in her mind, consistent with other properties in the area, as shown by the calculation sheet and her knowledge of the properties based on her years of service. Other properties in the area had effective ages from 1970 to 1990. The information revealed that in 1996 the assessment was $278,000, and she concluded that the 1997 assessment of $217,000 was based on a determination that the effective *625 age was 1960. The field inspector was given this sheet, and after visiting the property, reported that the 1960 effective age was erroneous, and he indicated on the data sheet that, in his opinion, the effective age should be 1980.
The witness testified that, from the information submitted by the field inspector, she recalculated the property value pursuant to the New Jersey State Manual for Assessors. Reclassifying the improvements pursuant to the manual and utilizing the cost approach, she arrived at an assessment of $808,400. The difference in effective age alone warranted a substantial upward adjustment in value.
She then tested her result by the use of comparable sales and found that her result fit into the 95% to 100% ratio of assessment to sales. The assessor testified that since she was unaware of the subject property being listed for sale or its listing price, they played no part in the subject property’s reassessment for 1998. Although the YCS in which the subject was situated contained insufficient sales for a satisfactory analysis, she found sufficient sales in other neighborhoods with properties that she deemed similar to the subject.
Taxpayer contends that the reassessment of the subject property was the result of spot assessment, requiring the voiding of the assessment for 1998 and rolling it back to its prior assessment. Two points are raised: (1) the reassessment program, in general, was not proper, and (2) independent of the reassessment program for 1998, taxpayer contends that the reassessment of the subject property was solely based upon the assessor’s knowledge of the sale price, and for no other reason.
Taxpayer submitted the testimony and report of an appraisal expert witness. This court finds the witness and the report to be of no value in the determination of this case. The witness provided no opinion as to whether or not the assessment maintenance procedure employed by the assessor was improper in general or as specifically applied to the subject property. The report renders an opinion that only the conduct of a revaluation provides an appropriate method of assessment maintenance. *626 Short of that, he suggests criteria for reassessment of property, which, in actuality, were met by the assessor herein.
For example, the report indicates that reassessments in which inspected properties number 25% annually, take four to five years to complete, thereby rendering the earlier inspection information stale. The assessor’s undisputed testimony indicates that on an annual basis, the assessor’s ofSee conducts physical onsite inspection (with some limited exceptions) of between 33% to 38% of all properties in the municipality, resulting in onsite inspections of the entire municipality being completed within three years. Taxpayer’s expert witness makes only general suggestions and comments with respect to reassessment practice but fails to render any opinion with respect to the reassessment of taxpayer’s property herein.
This court finds the assessor’s testimony totally reliable on the methodology utilized to conduct her reassessment programs up to and including the 1998 tax year. The witness indicated the institution of a computerized program to maintain records of all properties located in the municipality, which she utilized each year and to which she made additions and alterations. There is no evidence to contradict the assessor’s testimony that she utilized the New Jersey State Manual for Assessors in order to make her computations on all properties, including the subject. Each year, including the year in issue, a reassessment plan was approved by the county board of taxation and by the State Division of Taxation. There is no evidence that disputes her testimony that in fact, the assessor’s office conducted onsite inspections of approximately 30% to 38% of the municipality’s properties each year, in order to achieve 100% onsite inspections within three years. There is likewise no evidence submitted by the taxpayer suggesting that the assessor did not keep her office open to the public for inquiry and provide notice to the public as to the conduct of these reassessment programs.
In Regent Care Center, Inc. v. Hackensack City, 362 N.J.Super. 403, 828 A.2d 332 (App.Div.2003), on the issue of spot assessment, the Appellate Division of the Superior Court held that an asses *627 sor’s practice of using an “assessment maintenance program”[3] did not constitute spot assessment. The court found that, although there was not a city-wide revaluation, the reassessment of the subject property was constitutional under N.J.S.A. 54:4-23, which states:
All real property shall be assessed to the person owning the same on October 1 in each year. The assessor shall ... determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments.
The Regent Care court concluded that, pursuant to N.J.S.A. 54:4-23, an assessor not only has the authority to institute an assessment maintenance program but also has the duty to keep the tax rolls current. Id. at 415, 828 A.2d 332. Consequently, the court found that:
Performing a district-wide revaluation or reassessment every year would be the means best designed to meet that mandate. [However], Tt]hat is simply not feasible. Periodic revaluations or reassessments are feasible and are necessary to maintain uniform and non-discriminatory assessments.
Against this reality, N.J.S.A. 64:4-23 charges assessors with the obligation to keep the tax rolls current by assessing each property at its full and fair value each year.
[Regent Care, at 415, 828 A.2d 332 (citations omitted).]
As a result, the court had to balance the need for assessors to keep the tax rolls current against ensuring that assessors do not run afoul of the Constitution. The court further stated:
Assessors cannot be expected to do nothing in years between district-wide revaluations or reassessments. Their role is not that of a caretaker. In Tri-Terminal Corp. v. Borough of Edgewater, 68 N.J. 405, 346 A.2d 396 (1975), the Court made this plain and acknowledged the proper role of assessment maintenance: The law calls for the separate assessment of each parcel annually at its true value on the assessing date. While practicalities obviously preclude most assessors reviewing every assessment line item every year, there should nevertheless be alertness to changed valuation factors peculiarly affecting individual properties in years between revaluations and requiring prompt remsion of such assessments in fairness to the particular taxpayer or to the taxing district. It should be obvious that, absent such attention, the carrying over of assessments each year from one general revaluation to the next is not the proper discharge of the assessor’s function.
*628 [Id. at 416, 828 A.2d 332 (citations omitted) (emphasis added) ].
With specific reference to the subject property’s reassessment, taxpayer urges not only that the reassessment program was faulty, and therefore unconstitutional, but that the assessor merely raised the assessment on the subject property based upon knowledge that the property was listed for sale and the subject of a contract for $312,000. To this end, taxpayer submits her own testimony that she indicated to a representative of the assessor’s office (not the assessor) that she was purchasing the property and for the amount stated, and that there was always a “For Sale” sign on the property during the summer months of 1997, while the reassessment program was being conducted. From this, taxpayer concludes that the assessor had knowledge of the listing and contract price. Taxpayer further contends that the property was reassessed for no other reason.
This court finds that, in the first place, the assessor was unaware of the listing and contract price of the subject property during the conduct of the reassessment. This court further finds that mere knowledge of the existence of a sale (or, in this case, a contract price) does not render the reassessment of the subject property a prohibited spot assessment.
In West Milford Tp. v. Van Decker, 120 N.J. 354, 576 A.2d 881 (1990), the Supreme Court of New Jersey found that a reassessment based solely on the sale of the subject property is discriminatory. Id. at 361-362, 576 A.2d 881. As a result, the Van Decker court found that the Township’s practice of singling out for reassessment only those residential properties that had recently sold was a violation of both the New Jersey and United States Constitutions. Ibid. The court stated:
By singling out for reassessment only that small group of taxpayers who purchased homes in 1984 while leaving undisturbed the assessments of other property in the class, West Milford deviated from the well-established assessment policy of the State. Such spot assessments known as the “welcome stranger” pattern, are commonly recognized as intentional discriminatory practices.
Such spot assessments violate the New Jersey Constitution’s uniformity clause. We note that it is arbitrary intentional discrimination that is unconstitutional. A *629 municipality may revise assessments in years other than years of a municipal-wide revaluation for legitimate reasons ... However, under no circumstances can appraised valuation of property be increased merely because it has been sold.
Accordingly, the Township practice of increasing the assessed value only of homes purchased in the Township in 1984 and leaving the value of other homes undisturbed constitutes spot assessment in violation of the federal and state constitutions.
[Id. at 361-364, 576 A.2d 881 (citations omitted) (emphasis added).!
Thus, Van Decker stands for the following proposition: if the assessment is based solely on a sale of the subject property, and the assessor fails to assess other properties in the same class, then that practice constitutes prohibited spot assessment.
The Appellate Division revisited the issue of spot assessment in two recent decisions. In the first case, the court found that the assessor’s sole reason for reassessment was the recent sale of the subject properties. Centorino v. Tewksbury Tp., 347 N.J.Super. 256, 265, 789 A.2d 655 (App.Div.2001). In Centorino, the court held that an assessment is not necessarily discriminatory if the assessor fails to revisit other properties in the same class, as long as the assessor has some independent basis for the assessment. Id. 265-266, 789 A.2d 655. For example, if the assessor relies on “legitimate non-sales related justifications, such as additions to the property or the like,” such practice will not amount to unconstitutional spot assessment. Id. at 266, 789 A.2d 655. In Centorino, the assessor claimed that the sale of the subject property merely triggered his review of the property’s prior assessment, which led him to conclude that the property was undervalued. The assessor indicated that he based his increased assessment solely on the categorization of the property as a Class 18 Residence, rather than a Class 20 Residence. The Appellate Division found that the assessor could not adequately explain the difference between the two property classes. Consequently, the court found that the assessor had not established an independent basis for his practice and stated the following:
Where the assessor’s appraisals of the differences between these classes was so obviously subjective and discretionary, and not readily discernable, the tax assessor must establish additional objective proofs as to the property in question, and in *630 relation to other properties in the neighborhood, in order to rebut the presumption of validity of the 1999 County Tax Board judgment and to justify his statement that the subject property was not singled out solely on the basis of its sale. No such proof exists in the record____It appears that what occurred here was that the assessor really reassessed the Centorino property and singled it out for such treatment because of its sale price.
[Id. at 265, 789 A.2d 655.]
Conversely, in Brunetti v. Cherry Hill Tp., 21 N.J.Tax 80, 85 (App.Div.2002), certif. denied 175 N.J. 547, 816 A.2d 1049 (2003), the Appellate Division distinguished Centorino, supra, and held that, even if an assessor considers a pending or recent sale, so long as there is an independent basis for the assessment, the assessment is not an unconstitutional spot assessment. Specifically, the Brunetti court found that even though the increased assessment approximated the contract price (entered into before the sale), there was an independent basis for the assessor’s determination, and, therefore, the assessment was not an unconstitutional spot assessment, stating:
[T]he reassessment was triggered by three acts on the assessor’s part: (1) his determination to investigate the basis for the continued yearly rejection by the taxing authority of applications by Brunetti for a lowered assessment pursuant to the Farmland Assessment Act of 1964, N.J.S.A. 54:4-23.1 to — 23.22, and Brunetti’s seeming acquiescence in the authority’s action; (2) his decision to actually inspect the property; and (3) his discovery that the property was not used for farmland activity and did not contain undeveloped wetlands, as existing property records stated that it did.
[Brunetti, supra, at 81-82.]
The court concluded that the assessor based his decision to reassess the subject property on the fact that Brunetti had illegally claimed that portions of his property were wetlands, which significantly affected the value of the land. The court held:
In the present case, there is no evidence that Cherry Hill’s assessor, Glock, had knowledge of the impending sale of the Brunetti property or the contract sales price. Indeed, the evidence at trial, accepted by Judge Small, fully supports his conclusion that an adequate independent basis for the reassessment arose as the result of Glock’s determination to investigate Brunetti’s inexplicable acquiescence in the yearly denials of his Farmland Assessment applications. However, even if Glock were aware of the pending sale, his determination to reassess the Brunetti property is fully supported by the discovery that it did not contain the wetlands that had served to depress its valuation ... it is clear in this ease that the nonexistence of claimed wetlands was a distinct and definable factor that could significantly affect property value for tax purposes.
[Brunetti, supra, 21 N.J.Tax at 85 (citations omitted) ].
*631 In a recent opinion by Judge Kuskin, Mountain View Crossing Investors, LLC v. Wayne Tp., 20 N.J.Tax 612 (Tax 2003), the court concluded that Centorino and Brunetti stood for the proposition that “a prohibited spot assessment occurs only when the assessor has no basis for revising the assessment other than a sale of the property.” Id. at 620. Furthermore, the court reasoned that an assessment passes constitutional muster if there are “legitimate reasons independent of a sale even in the absence of a municipal-wide assessment.” Ibid. (citing West Milford v. Van Decker, supra, 120 N.J. at 362, 576 A.2d 881). In Mountain View Crossing, although the sale of the subject property triggered the review of the assessment on the property, the court fond that there was an independent basis for the reassessment. Ibid. The court stated:
Here, there is no dispute that the sale of the subject property on December 29, 1998 triggered the assessor’s review of the assessment on the subject property. The assessor’s testimony demonstrates, however, that the assessment increase she placed on the property for tax years 2001 and 2002 was based on independent information provided to her in August 2000 during a settlement conference relating to the 1999 and 2000 appeals she caused to be filed. Before receipt of this information, the assessor never had received accurate actual full-year income and expense information for the subject property.
[Mountain View, supra, 20 N.J.Tax at 620.]
Therefore, even if an assessor is aware of a pending sale, so long as there is an independent basis for the assessment, the court will not find an unconstitutional spot assessment. Ibid. See also, Corrado v. Montclair Tp., 18 N.J.Tax 200 (Tax 1999); Shippee v. Brick Tp., 20 N.J.Tax 427 (Tax 2002).
Taxpayer has offered no testimony or documentary evidence that would controvert the testimony rendered by the assessor. This court finds that the assessor treated the subject property in the manner in which she testified. She indicated, in the first place as has hereinabove set forth, that she was unaware as to the real estate activity of the subject property. Attention was called to the subject property solely by means of the computerized printout data sheet, demonstrating a 1960 effective age on the subject property, which in her mind meant “deplorable condition,” in an area and among properties that she knew from her experience in the municipality to be of much higher quality. A further review of *632 the subject data sheet indicated that the 1997 assessment was $217,000, but the year before, the assessment was $278,000, and she was unaware as to why there should be such a decrease in assessment. Not relying on guesswork, she turned the matter over to a site inspector, with the computerized information which ultimately became the subject of a report demonstrating that the 1960 effective age was placed on the subject property for 1997 in error. She concluded, based upon the information supplied by the onsite inspector that the effective age should be 1980, consistent with the inspection and other information in her possession. From there, the assessor recalculated the property based upon all the information given on the report, as well as the information set forth on the printout, pursuant to the New Jersey State Manual for Assessors and ultimately arrived at an assessment of $308,400. The assessor further utilized listing prices and sales in the VCS in which the subject was situate, along with listings and sales in neighboring VCSs containing properties of a similar nature to the subject. Through this procedure the witness indicated sufficient confirmation that her recalculation as to the subject property provided a fair and accurate assessment.
This court finds that the assessor’s procedure and methodology utilized to reassess the subject property amply demonstrate “legitimate reasons” as defined by the aforementioned authorities.
For the reasons set forth above, this court concludes that the subject property’s reassessment was not a spot assessment. Since taxpayer’s contention heard in another court as to valuation was denied, this court’s denial of taxpayer’s contention as to spot assessment results, therefore, in an affirmance of the assessment. That assessment for the subject property shall therefore remain for 1998 as follows:
Land $114,000
Improvements 194,400
Total $308,400.

 Schumar v. Bernardsville Bor., 347 N.J.Super. 325, 790 A.2d 171 (App.Div. 2001).

 In evidence are reassessment plans for the 1998 tax year, the year in issue, and prior years. Each plan is in actuality an application for the assessor to conduct a reassessment of the entire municipality pursuant to N.J.S.A. 54:4-23, which requires the assessor to maintain assessments current. The reassessment applications for 1998 and for the prior years demonstrate how the reassessment project is to be completed. Each such application demonstrates approval by the county board of taxation and the New Jersey Division of Taxation.
N.J.S.A. 54:4-23 was amended by L. 2001, c. 101 to impose additional requirements on an assessor wishing to reassess fewer than all properties in a taxing district. The amendment is not applicable to the time period covered by the assessments which are challenged in this case.

 Assessment maintenance program generally refers to “the practice by which an assessor changes some assessments in a year when a district-wide revaluation or reassessment is not performed." Regent Care, at 411-12, 828 A.2d 332.