NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

_____

|  |  |  |
|---|---|---|
| SENOS SUZANNE & SCULLY C/O BOYLE, | : | TAX COURT OF NEW JERSEY DOCKET NO: 010067-2022 |
| Plaintiff, | : | |
| vs. | : | |
| TOWNSHIP OF BRICK, | : | |
| Defendant. | : | |

_____

|  |  |  |
|---|---|---|
| LA PORTE ASSOCIATES C/O DUCH, | : | TAX COURT OF NEW JERSEY DOCKET NO: 010070-2022 |
| Plaintiff, | : | |
| vs. | : | |
| TOWNSHIP OF BRICK, | : | |
| Defendant. | : | |

_____

|  |  |  |
|---|---|---|
| D&R RENTO HOLDINGS LLC C/O, | : | TAX COURT OF NEW JERSEY DOCKET NO: 010072-2022 |
| Plaintiff, | : | |
| vs. | : | |
| TOWNSHIP OF BRICK, | : | |
| Defendant. | : | |

_____

Decided June 27, 2025

Jack A. Triana for plaintiffs (Triana & Traina, attorneys).

Scott William Kenneally for defendant (Starkey, Kelly, Kenneally, Cunningham, Turnbach & Yannone, attorneys).

CIMINO, J.T.C.

Three taxpayers each own beachfront property in Brick Township. After Superstorm Sandy in 2012, the assessor reduced the land portion of the assessment of each property by twenty-five percent due to external obsolescence seemingly attributed to destruction of the road network and public utilities servicing the properties. In 2021, the assessor increased the land assessments fifteen of the twenty-five percent. The taxpayers seek to void these increases. They assert that the increases are either illegal spot assessments or that the assessor failed to have an approved assessment compliance plan. While the municipality certifies repair of the road network and the public utilities, and the construction of protective dunes and a revetment, the assessor's rationale for increasing the assessments is not clear. The court denies summary judgment.

I.

Taxpayers, D&R Rento Holdings, La Porte Associates and Suzanne Senos are the owners of lots 1, 3 and 5, respectively, of block 58 of the Tax Map of Brick Township. The properties are located on Dune Avenue. The lots are similar in size,

and each has seventy feet of beach frontage. A single-family home is the current improvement on each lot.

In 2010, Brick Township conducted a revaluation of property assessments. For administrative purposes, assessors break down assessments into land and improvement components. Texas Eastern Transmission Corp. v Township of East Amwell, 13 N.J. Tax 24, 34 (Tax 1992), aff'd sub nom., 18 N.J. Tax 126 (App. Div. 1999). See also In re Kents 2124 Atl. Ave., Inc., 34 N.J. 21, 33-34 (1961). For the three properties in question, the assessor placed the land assessment at $1.59 million. The improvement assessment varied for each property.[1]

After the devastation of Superstorm Sandy in late October 2012, the assessor adjusted the assessments of the properties to reflect the awesome devastation of the storm.[2] The assessor reduced the improvement assessments between thirty to one-hundred percent.[3] The assessor also reduced the land assessments by twenty-five

---

[1] The lot 1 improvement assessment was $535,900. The lot 3 assessment improvement was $211,300. The lot 5 assessment improvement was $486,400.

[2] The storm damaged 325,000 housing units in New Jersey. Stephanie Hoopes Halpin, Rutgers Univ. Sch. of Pub. Affs. and Admin., The Impact of Superstorm Sandy on New Jersey Towns and Households 8 (2013). For ninety-municipalities, power was out for more than ten days. Ibid.

[3] The lot 1 structure was reduced 30%. The lot 3 structure was reduced 100%. The lot 5 structure was reduced 60%.

percent, from $1.59 million per lot to $1.19 million for external obsolescence.[4]

External obsolescence is generally a reduction due to factors external to the land that

affect the utility of the land.  BASF Corp. Coating  & Ink Div. v. Town of Belvidere,

23 N.J. Tax 551, 580 (Tax 2007),  Westwood Lanes, Inc. v. Borough of Garwood, 24

N.J. Tax 239, 262 (Tax 2008).  The reductions here reflected external obsolescence

seemingly attributable to the destruction of the road and public utility infrastructure.

With the repair or rebuilding of the houses on the properties, the assessor

increased the improvement assessments.  For example, the lot 1 improvement

assessment increased in 2013 and then again in 2015; the lot 3 improvement

assessment increased in 2016; and the lot 5 improvement assessment increased in

2017.  However, the assessor did not increase any of the land assessments until 2021.

Just prior to the 2021 increase, the assessments were as follows: [5]

### Assessed Value with Twenty-Five Percent Land Reduction

|  | Block 58, Lot 1 | Block 58, Lot 3 | Block 58, Lot 5 |
|---|---|---|---|
| Land | $ 1,189,000 | $ 1,070,100 | $ 1,189,000 |
| Improvement | $   535,900 | $   501,700 | $   486,400 |
| Total | $ 1,724,900 | $ 1,571,800 | $ 1,675,400 |

---

[4]  To be exact, the assessor reduced the land assessment for each parcel from $1,585,300 to $1,189,000.

[5]  It is unclear why between 2013 and 2020, the Lot 3 land assessment was further reduced to $1,070,100.

In 2021, the assessor increased the land assessment for each property to $1.43 million which is still ten percent below the 2010 assessment. The increased assessments are now: [6]

**Assessed Value with Ten Percent Land Reduction**

|  | Block 58, Lot 1 | Block 58, Lot 3 | Block 58, Lot 5 |
|---|---|---|---|
| Land | $ 1,426,800 | $ 1,428,000 | $ 1,426,800 |
| Improvement | $ 535,900 | $ 501,700 | $ 486,400 |
| Total | $ 1,962,700 | $ 1,929,700 | $ 1,913,200 |

The township engineer certified repair of the roads and public utilities, and the construction of a dune structure and revetment. However, the assessor has not clearly spelled out the reason for the increases, or why the increases did not revert to the pre-Sandy level.

II.

The taxpayers move for summary judgment asserting the municipality has engaged in spot assessments or failed to have an approved compliance plan. On summary judgment, the court assesses "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540

---

[6] It is likewise unclear why the lot 3 land assessment was increased to $1,428,000 which is greater than the $1,426,800 land assessment on lots 1 and 5.

(1995).  Since there are factual issues in dispute, this matter is not ripe for summary judgment.

III.

The Uniformity Clause of the New Jersey Constitution generally requires assessment of all real property at the same standard of value.  N.J. Const. art. VIII, § 1, ¶ 1(a).  Proper assessment valuation is the bedrock of uniformity.

Assessed property values are set and maintained a number of ways.  First, a municipality can conduct a revaluation.  An outside appraisal company values all properties in the municipality after an inspection of the exterior and an attempt to inspect the interior.  N.J.S.A. 54:1-35.35.  N.J.A.C. 18:12A-1.14(b)(4).  The exercise is usually an expensive endeavor for the municipality.  See generally N.J.S.A. 54:1-35.36, N.J.A.C. 18:12-4.1 to 4.11.

Second, the assessor can conduct a district-wide reassessment to adjust the values of all properties after review of the exterior of all properties.  N.J.S.A. 54:4-23, N.J.A.C. 18:12A-1.14(c).  This is generally an interim measure between revaluations.  It is a timely and possibly costly endeavor.

Third, assessors must perform basic assessment maintenance.  N.J.S.A. 54:4-23.  See N.J.A.C. 18:12A-1.14(j)(3)(viii).  The assessor needs to be alert for changes in individual properties that affect assessed value.  Tri-Terminal Corp. v. Borough of Edgewater, 68 N.J. 405, 414 (1975).  The assessor must track changes in the physical

6

characteristics or the legally permissible uses of the property. Ibid. For example, physical changes could be an addition to a residence, or a garage may burn to the ground. See N.J.A.C. 18:12A-1.14(j)(3)(viii). Legal changes include variances allowing a larger structure to be built or changes in the zoning code limiting commercial construction. See Ibid. These changes do not always dictate a change in the assessed value of the property. However, these changes alert an assessor that further investigation is necessary.

Both physical and legal changes differ from appreciation or depreciation driven by the broad market. Market driven changes are already captured by an "average ratio" which the Director of the Division of Taxation calculates each year through a sales study. N.J.S.A. 54:1-35a, -35b, -35.1 to -35.3.

Fourth, the assessor can employ a compliance plan. N.J.S.A. 54:4-23. A compliance plan is a specially authorized type of assessment maintenance designed to equalize uneven appreciation or depreciation between (1) different neighborhoods in a municipality or (2) different types of property classes (residential versus commercial). Ibid., N.J.A.C. 18:12A-1.14(j), City of Elizabeth v. 264 First Street, LLC, 28 N.J. Tax 408, 437 (Tax 2015) (compliance plans required for property class reviews). Prior to the Legislature codifying this procedure and the subsequent adoption of detailed regulations by the Director, our courts found that compliance plans to adjust certain property classes to be appropriate. Regent Care Ctr., Inc. v.

City of Hackensack, 362 N.J. Super. 403, 419-420 (App. Div. 2003), Frieman v. Township of Randolph, 216 N.J. Super. 507, 510-11 (App. Div. 1987).

The following example demonstrates the importance of a compliance plan. Neighborhood A values are increasing at ten percent over base per year and neighborhood B values are increasing at twenty percent over base per year. After a few years, the average ratio for the entire municipality may not be applicable to either neighborhood. If both neighborhood A and neighborhood B have a property assessed at $100,000, after five years the property would be worth $150,000 in neighborhood A and $200,000 in neighborhood B. The owners of each respective property would continue to pay the same amount of tax even though the property in neighborhood B is worth one-third more.

Recognizing the inequities of uneven appreciation (or depreciation) within a municipality between municipal-wide revaluations or reassessments, the Legislature allows assessors to implement a compliance plan reassessing only a portion of a municipality. L. 2001, c. 101, § 1 (codified as amended N.J.S.A. 54:4-23). Previously, an assessor could only correct this inequity by undertaking a reevaluation or reassessment of the whole municipality. This is a costly and time-consuming proposition. With a compliance plan, an assessor can focus in on the neighborhoods or property classes experiencing a change in value not commensurate with the balance of the municipality.

A compliance plan allows an assessor to update assessments despite the lack of any physical or legal change. To prevent abuse, the assessor must obtain approval from the County Board of Taxation. N.J.S.A. 54:4-23, N.J.A.C. 18:12A-1.14(j)(2). The assessor must demonstrate a sufficient variance in assessment between classes or neighborhoods. See N.J.A.C. 18:12A-1.14(j)(3)(v).

In adopting compliance plan regulations, the Director provided examples of what constitutes traditional assessment maintenance not requiring a compliance plan. N.J.A.C. 18:12A-1.14(j)(3)(viii). Physical changes which do not require a compliance plan include added assessments, omitted assessments, omitted-added assessments, demolitions, site contamination, removal of contaminated soil and property remediation, and damage from storm, cyclone, tornado, earthquake, fire, flood, hurricane, vandalism or other casualty. Ibid. Legal changes not requiring a compliance plan include governmentally imposed restrictions, planning board and/or zoning board of adjustment approvals, subdivisions and mergers.[7] Ibid.

---

[7] The Director also recognized corrections of errors such as those caused by clerical, typographical, transpositional, physical descriptive or mathematical errors do not constitute or need a compliance plan but are obviously part and parcel of assessment maintenance. Ibid. It also goes without saying that approved revaluations do not require a compliance plan since revaluations are approved by the Director. Ibid. Qualified farmland does not require a compliance plan since this is addressed in a separate statutory section. Ibid. Changes resulting from appeals or settlement agreements do not require compliance plans since they are subject to oversight of either a county board of taxation or the courts. Ibid.

9

Finally, an assessor cannot engage in spot assessments. A spot assessment is an illegal adjustment of assessed value based upon an appreciation in value not tied to any physical or legal change, nor authorized by a compliance plan. See Centarino v. Township of Tewksbury, 347 N.J. Super. 256, 266-67, 20 N.J. Tax 35, 44-45 (App. Div. 2001). Sale of the subject property or a nearby property usually presages such change. Township of West Milford v. Van Decker, 120 N.J. 354, 361-62 (1990). In the normal course, the average ratio prepared by the Director captures increases in value that are not the result of physical or legal changes. See N.J.S.A. 54:1-35a(a). Spot assessments short-circuit that process.

Spot assessments are especially egregious if the decision to spot assess is based solely upon the sale of the property. The spot assessment impacts the taxpayer twice. First, and most obvious, is the increase in the assessed value. Second, the sale, as part of the sales study of the municipality, impacts the average ratio. Ibid. With this double effect, the taxpayer would face an effective increase in taxation even beyond the intent of the spot assessment.

IV.

In this case, the taxpayers allege that the assessor engaged in either illegal spot assessments or failed to secure proper approval of a compliance plan. However, the court has more to decide than whether there are spot assessments or an unapproved compliance plan. The municipality has filed a counterclaim challenging the

10

assessor's assessment. Assessors "'perform quasi-judicial functions" by applying 'independent judgment.'" <u>VNO 1105 State Hwy. 36, LLC v. Township of Hazlet</u>, 33 N.J. Tax 20, 26 (App. Div. 2021) (quoting <u>Ream v. Kuhlmen</u>, 112 N.J. Super. 175, 190 (App. Div. 1970)). Municipalities are free to challenge the assessments of their own assessor.[8] N.J.S.A. 54:3-21(a).

There are two competing interests at play. First, the appealing property owners have an interest in not having their properties spot assessed or subject to a rogue compliance plan. Second, all the taxpayers in the municipality have an interest in having all properties assessed fairly by the assessor to ensure everyone pays their fair share of taxes. Despite competing interests, the goal is the same, the constitutional mandate of uniformity in taxation.

Traditionally, a taxpayer had to establish that assessed value exceeded true value. <u>See</u> <u>Royal Mfg. Co. v. Bd. of Equalization of Taxes</u>, 76 N.J.L. 402, 404-05 (Sup. Ct. 1908), <u>aff'd</u>, 78 N.J.L. 337 (E. & A. 1909). With stable property values, this was a workable standard for tax appeals. With appreciating property values, the assessed value may represent only a fraction of true value after only a couple of years. Thus, even if a property was over-assessed as compared to other properties, so long as the assessed value was below true value, no downward adjustment in

---

[8] Typically, the assessor and the municipality are on the same side with the municipality merely defending the assessor's assessment from attack by a taxpayer. <u>See</u> N.J.A.C. 18:17-4.1(a)(5)

assessed value was warranted. Ibid. If a taxpayer wanted the fair taxation which results from fair assessments, the remedy was to raise the assessments of all properties in the taxing district to true value. Kents, 34 N.J. at 25. A taxpayer would have the Herculean task of proving the individual true values of all properties in the taxing district.

By the early 1960's, with assessed values only representing a fraction of true value, a tax appeal was fast becoming an illusionary remedy. Recognizing the inequities, the Supreme Court in Kents allowed taxpayers to utilize the Director's school aid ratio to establish discriminatory treatment. Kents, 34 N.J. at 31-32. The Legislature had mandated the Director promulgate the school aid ratio for "the purpose of fixing a basis for the distribution to municipalities of State aid for education." Id. at 26. See N.J.S.A. 54:1-35.1. The ratio compares assessed value to true value, based upon sales of properties sold in each municipality. N.J.S.A. 54:1-35.3, Township of Jefferson v. Dir., Div. of Tax'n, 26 N.J. Tax 1, 5 n.5 (Tax 2011) (citing Memorandum from the Dep't of the Treas., Div. of Tax'n, Local Prop. Tax Bureau, to The Sec'y of Each Cnty. Bd. of Tax'n, All Mun. Assessors, and All Mun. Clerks (July 30, 1970)). For consistency, the school aid ratio calculation is uniform statewide. See Ibid.

The Legislature further advanced the goal of uniformity by enacting Chapter 123 in 1973. L. 1973, c. 123. Initially, Chapter 123 relied upon an average ratio

similar to, but not the same as, the school aid ratio. Id. at § 1. In 1979, the Legislature amended Chapter 123 to rely upon the school aid ratio as the average ratio. L. 1979, c. 51, § 1 (codified at amended at N.J.S.A. 54:1-35a).

In adopting Chapter 123, the Legislature recognized that determining property values is not an exact science. "Mathematical perfection in taxation is unobtainable, and hence relief should not be denied merely because the result lacks absolute precision. The injured taxpayer is entitled to practical relief." Kents, 34 N.J. at 32. Thus, there is a "common level range" of plus or minus fifteen percent of the "average ratio." L. 1973, c. 123, § 1 (codified as amended at N.J.S.A. 54:1-35a(b)). The bounds of the "common level range" are known as the "lower limit" and the "upper limit." See N.J.S.A. 54:3-22(c), 54:51A-6(a). Dividing the assessed value by the true value yields a ratio. A ratio outside the lower or upper limit requires adjustment of the assessed value. [9] N.J.S.A. 54:3-22, 54:51A-6.

Except for revaluation years and district-wide reassessment years where the assessed value is set to one-hundred percent of true value, the municipality has an automatic counterclaim despite the lack of an affirmative counterclaim. Campbell Soup Co. v. City of Camden, 16 N.J. Tax 219, 228 (Tax 1996). In this case, the

---

[9] Certain exceptions apply in revaluation and district-wide reassessment years where the assessment is set to true value, the assessment is greater than true value or the Chapter 123 ratio is greater than 100%. A handy chart for dealing with these issues can be found in Passaic St. Realty Assoc., Inc. v. City of Garfield, 13 N.J. Tax 482, 486 (Tax 1994).

13

municipality filed an affirmative counterclaim challenging the assessed value of the property. An affirmative counterclaim precludes a taxpayer from unilaterally withdrawing the claim if things are not going well for taxpayer at trial. Id. at 228. Township of Cherry Hill v. U. S. Life Ins. Co. of N.Y., 176 N.J. Super. 254, 261, 1 N.J. Tax 236, 243 (Tax 1980); Passaic St. Realty Assoc., Inc. v. City of Garfield, 13 N.J. Tax 482, 485, 488 (Tax 1994).

A finding of spot assessments or an unapproved compliance plan may require the court to reduce the value imposed to reflect the twenty-five percent land assessment reduction. The question then arises whether the court should deny the municipality's pursuit of a counterclaim. To deny the municipality the right to pursue a counterclaim because of a misdeed of the assessor is extraordinary relief reserved for the most egregious of circumstances. 264 First Street, 28 N.J. Tax at 451. "The appeal procedure is a necessary tool for attaining uniformity and equality in a real estate tax system. . . ." Comment, The Road to Uniformity in Real Estate Taxation: Valuation and Appeal, 124 U. Pa. L. Rev. 1418, 1445 (1976). Denying a counterclaim cuts against the goal of the Uniformity Clause to ensure uniformity.

V.

The assessor adjusted the twenty-five percent reduction to the land assessments to ten percent in 2021. Taxpayers appealed their 2022 assessments. The

common level range of values in 2022 for assessments with the land assessments only being reduced ten percent are:

**Common Level Range of 2022 Values**
**with Ten Percent Land Reduction**

|          | Block 58, Lot 1 | Block 58, Lot 3 | Block 58, Lot 5 |
|----------|-----------------|-----------------|-----------------|
| Below    | $ 2,078,031     | $ 2,043,092     | $ 2,025,622     |
| Average  | $ 2,389,748     | $ 2,349,568     | $ 2,329,478     |
| Above    | $ 2,811,488     | $ 2,764,217     | $ 2,740,582     |

Taxpayers seek restoration of the twenty-five percent reduction in land assessments. The common level range of values in 2022 for the total assessed values with the twenty-five percent land assessment reductions are: [10]

**Common Level Range of 2022 Values**
**with Twenty-Five Percent Land Reduction**

|          | Block 58, Lot 1 | Block 58, Lot 3 | Block 58, Lot 5 |
|----------|-----------------|-----------------|-----------------|
| Below    | $ 1,826,257     | $ 1,664,161     | $ 1,773,849     |
| Average  | $ 2,100,207     | $ 1,913,795     | $ 2,039,937     |
| Above    | $ 2,470,849     | $ 2,251,540     | $ 2,399,943     |

With the assessments based upon a ten percent land reduction, no increases will occur unless the municipality can prove 2022 true values in excess of about $2.8

---

[10] The calculations for the common level range of values are made by dividing the total assessed value by the upper limit, average ratio and lower limit. The Chapter 123 ratio for Brick Township for 2022 is as follows:

|               |        |
|---------------|--------|
| Average Ratio | 82.13% |
| Lower Limit   | 69.81% |
| Upper Limit   | 94.45% |

15

million.[11]   With a restoration of the twenty-five percent reduction, the municipality only has to prove 2022 true values in excess of+- about $2.4 million.  With reduced assessments, the municipality has lower thresholds to cross to obtain an increase.

What does this all mean?  If the taxpayers believe the properties will appraise for more than $2.4 million dollars for 2022, they should consider abandoning their claim of improper spot assessments or an unapproved compliance plan.  This may shield the taxpayers from an increase by requiring the municipality to prove a 2022 true value of at least $2.8 million instead of $2.4 million.

Overall, this is a thorny issue which summary judgment is not well-suited to resolve.  The court needs to hear from both the present and the prior assessor to determine the credibility of their reasoning for adjusting the assessments.  However, this issue may be moot if the true value of each property exceeds about $2.4 million for the 2022 tax year.

The court denies summary judgment.  The matter will be set down for trial with the court determining both the existence of improper spot assessments or a compliance plan, and the value of the properties for 2022.  The court will afford the

---

[11] In deciding tax appeals, the court considers the total assessed value.  The separate land and improvement assessment are for the administrative convenience of the assessor.  Texas Eastern, 13 N.J. Tax at 34.  See also Kents, 34 N.J. at 33-34.

parties additional time to finalize their appraisals and secure the attendance of their appraisers at trial.